*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0279P (6th Cir.)
File Name: 02a0279p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　*v.*　　　　　　　　　　No. 00-5079

SCOTT LEE HAYNES,
　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 99-10008—James D. Todd, Chief District Judge.

Argued: April 27, 2001

Decided and Filed: August 16, 2002

Before: BOGGS and CLAY, Circuit Judges; ROBERTS,
District Judge.*

_____

## COUNSEL

**ARGUED:** C. Mark Donahoe, BYRD, DONAHOE & BYRD, Jackson, Tennessee, for Appellant. Lennard B. Register III, ASSISTANT UNITED STATES ATTORNEY,

---

\* The Honorable Victoria A. Roberts, United States District Judge for the Eastern District of Michigan, sitting by designation.

Jackson, Tennessee, for Appellee. **ON BRIEF:** C. Mark Donahoe, BYRD, DONAHOE & BYRD, Jackson, Tennessee, for Appellant. Lennard B. Register III, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

ROBERTS, D. J., delivered the opinion of the court, in which CLAY, J., joined. BOGGS, J. (pp. 26-31), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

ROBERTS, District Judge.

## I.    *Introduction*

On February 1, 1999, Defendant Scott Lee Haynes (hereinafter, "Haynes") was indicted in the United States District Court for the Western District of Tennessee on two counts: (1) for unlawfully possessing a firearm which, as a convicted felon, was a violation of 18 U.S.C. § 922(g); and (2) for unlawfully possessing a stolen firearm and transporting that firearm in interstate commerce, in violation of 18 U.S.C. §§ 922(j) and 924(a)(4). Haynes subsequently filed a Motion to Suppress, which was denied following a hearing on July 2, 1999.

Thereafter, Haynes pleaded guilty to Count 1 of the indictment. The plea agreement provided that the Government would dismiss Count 2. Pursuant to a Rule 11 plea agreement, Haynes reserved the right to appeal the denial of his Motion to Suppress. On January 11, 2000, Haynes was sentenced to 180 months of incarceration and 3 years of supervised release.

This appeal followed. For the reasons stated below, we **REVERSE** the denial of the Motion to Suppress with respect to the evidence found in Haynes' car but **AFFIRM** the denial

564, 575 (1985). No objective evidence contradicts the officers' story; nor are the stories so internally inconsistent or implausible on their face that no one could believe them. The court's contrary opinion either relies wholesale on the accuracy of Haynes's witnesses, or holds the district judge to a *falso in unius* theory, where any indication of disbelief in a portion of an officer's testimony bars the judge from crediting any part of it. This goes beyond our review for clear error, and I therefore respectfully dissent as to the validity of the search of Haynes's car.

There is also no indication that the officers made any coercive or even persuasive statements to Haynes based on the earlier search (for example, something like: "We know you have a gun in there" or: "It'll go easier on you if you consent"). Haynes's extensive familiarity with the criminal justice system, alluded to by all parties, the district court, and the majority opinion, is some support for a finding that his consent, if indeed given (as the judge's credibility determination concluded), was a knowing and voluntary one.

The court's analogy to and reliance on *United States v. Worley*, 193 F.3d 380, 386-87 (6th Cir. 1999) is, in my opinion, misplaced. In *Worley*, we were simply interpreting a statement that the defendant clearly made: "You've got the badge, I guess you can." Under those circumstances, we held that the statement indicated a submission to authority rather than consent, and certainly not a clear and positive statement of consent. In our case, if we do not find clear error in the judge's determination of consent, we are left with interpreting a far more ambiguous set of circumstances. Other than the general fact of being under arrest, which does not vitiate consent to a search, there was nothing in the facts found credible by the district judge that would lead to a finding of lack of voluntariness. On the judge's credibility finding, Haynes's statements *were* "clear and positive" as to consent.

It is true that the testimony reveals two very different general stories. I, or any other judge, reading the cold record, might be inclined to believe that Haynes's is closer to the truth than that of the police officers. However, that is not our task. The district judge saw the witnesses, made a defensible conclusion in the face of conflicting evidence, and did not, in my opinion, commit clear error factually, or any error legally. Indeed, the majority opinion states, at page 18: "It may be, as the district court found, that Haynes consented to the search of his car after it had already begun." If that is so, then the judge made a choice between two possible stories. The court's analysis of reasons to disagree with Judge Todd (especially at lines 356-99) does not, in my opinion, rise to the level cited in *Anderson v. City of Bessemer City*, 470 U.S.

with respect to the statement he gave to the police following his arrest.

## II.    *Background*

Haynes was arrested by the Union City, Tennessee police department on October 23, 1998 at the apartment of Janice Justis[1]. The circumstances leading to the arrest were described by Sergeant Michael George during the suppression hearing. George testified that, in the latter part of September 1998, he received information from authorities in Illinois that Haynes was wanted for burglaries and for parole violations. The items Haynes was alleged to have stolen included several firearms and several thousand dollars worth of jewelry. George was informed that Haynes was armed with a semiautomatic handgun, was dangerous, and had told his attorney that he would not be taken alive.

After receiving information that led him to believe that Haynes was staying in Justis' apartment, which was within the Union City Housing Authority complex, George contacted the housing manager. He was told that a white male fitting Haynes' description had pulled up in front of Justis' apartment in a gray Firebird. George was given the license plate number.

George then located Lieutenant Rick Kelly who, with Captain Vastbinder, went to check the apartment. Patrolmen Danny Carr and Tommy Lemons were also instructed to go to the apartment. Approaching the apartment, George heard Kelly's voice coming from inside the apartment. Upon entering the apartment, George saw a white woman, Kelly and Vastbinder. What occurred after that is in dispute.

George testified that he was in a bedroom of the apartment when Haynes was discovered by Carr and Lemons to be hiding between a mattress and box spring. To George's

---

[1] The former Janice Justis is now Janice Haynes, but hereinafter will be referred to as "Justis."

knowledge, Haynes was cuffed while in the bedroom. When asked whether Haynes was patted down at that time, George replied, "I would think so." When asked whether a set of car keys was removed from Haynes' pocket in the bedroom, George stated, "I don't know, sir." The keys "may have been taken out. I don't know if they were or not." George denied having told defense counsel and Federal Defenders Office Investigator Chris Odden that the car keys were taken out of Haynes pocket when he was patted down in the bedroom.

According to George, neither he, Carr nor Lemons left the bedroom before Haynes was taken out. When Carr and Lemons took Haynes outside, George remained in the bedroom. About ten or fifteen minutes later, the Chief of Police informed George that Haynes had given consent to search his vehicle. George denied any knowledge of an officer entering Haynes' car until he was taken outside and gave his oral consent.

Carr's testimony differs from George in one significant respect. Carr denies that Haynes was patted down when he was in the bedroom. He states that he and Lemons stood Haynes up and took him straight outside. Only upon leaving the apartment did Haynes get patted down. According to Carr, it was not until that time that he removed the keys from Haynes' pocket.

After Carr discovered that Haynes had keys on him, Carr testified that he asked Haynes whether the gray Firebird was his. Haynes replied that the car was his, but that it was registered to his daughter. Haynes informed Carr that he had purchased the car, and that anything in it was his. Then, according to Carr, he and Haynes had the following exchange:

> I told him we needed to check the car if we could and asked him if that would be okay. He stated yeah but was concerned about his daughter, about it being registered to his daughter. And we asked him again – asked him, basically, the same question: if it was okay if we searched the car. He said yeah, but he just didn't want to get his daughter in trouble.

who took him out of the building, and even his own witnesses agree that there were two officers who did that.

To the extent that there were inconsistencies in the officers' various stories, as stated by Judge Todd in passing (JA 250), those inconsistencies appear to focus on the initial entry into the building, by Vastbinder, Kelly, and others, centering on who it was that opened the door, and how that person was treated. There is thus no inconsistency, either logically or in the weighing of credibility, in Judge Todd's finding.

The second problematic result in the majority opinion concerns the correct legal rule, even when we assume that there had been an earlier search. Under this circumstance, the court is correct that the earlier search, if it uncovered relevant evidence, would not be validated by a subsequent consent. However, the principle is equally well established that a second search can be valid if supported by independent consent. See *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000); *United States v. Carson*, 793 F.2d 1141, 1155-58 (10th Cir. 1986). In this case, it seems undisputed from the facts that if there were an earlier search, that search did not uncover the relevant evidence of the illicit firearm. The only testimony as to the discovery of that firearm is that it was done by Officer Lemons, subsequent to Haynes's having been placed in the police car. The gun was found behind the driver's seat, under "KFC sacks and papers." (JA 165). Therefore, the first search would be relevant only to the extent that it in some way overbore the will of Haynes or caused him to believe that any resistance to a request would be futile. I believe that the record will not support such a conclusion.

First, there is no indication in the judge's findings that Haynes even knew of any putative earlier search. The majority's opinion states that he saw an earlier search. Maj. Op. at 23. While *Haynes's version* of the facts is that the search was going on when he came out of the house, there is nothing in the judge's ruling that indicates that he credited that statement In fact, Judge Todd specifically stated (JA 253), "I don't credit Mr. Haynes' testimony."

with decision-making responsibility, the judge found the officers to be credible.

It is true that, in the of course his oral presentation from the bench, the judge stated that:   "[it] does seem clear that somebody went into the car while Mr. Haynes was still in the house." (JA 250).  Since he ultimately placed no controlling weight on that statement, his statement can, in my view, best be read as an example of the dangers of ruling from the bench without a review of the transcript and a subsequent written conformation or correction of that transcript.  Rather, I would read that statement as not contradicting the officers' general credibility, but simply noting the fact that there was consistent testimony by some of the defense witnesses as to their version.  The judge then chose to rule on the basis that there was valid consent *even if* there had been an earlier search.

In particular, the officers' accounts are consistent that two officers, Carr and Lemons, took control of Haynes in the bedroom, took him outside the building and searched him and obtained the key.  There is no indication from any source that any officer other than Carr and Lemons participated in this endeavor, nor that any other specific officer took the keys and went out to the car.

On the other hand, the testimony of the opposing witnesses is uncertain and contradictory on this point.  If Carr and Lemons were the two officers who took custody of Haynes and took him out of the building, then the officer who made the alleged "early search" must have been someone else.  Yet the citizen witnesses have no consistent theory of who that officer was.   One witness, Carla Vibbert, specifically identified the officer who did so as Officer George, but also testified, that the searching officer was in uniform, when it is undisputed that George was in plain clothes. (JA 114-17).  Haynes implies that Lemons did not participate in taking him out of the building (JA 240), making it plausible for Lemons to have been the initial searching officer, but he then has no explanation for the identity of the other of the two officers

Armed with what he believed to be Haynes' consent, Carr used the key to open the Firebird door; it had previously been locked.

Lemons' testimony mirrors that of Carr, except that Lemons did not know whether the Firebird doors were locked.  Lemons additionally testified that, during his and Carr's search of the Firebird, he found a .357 Magnum under the floorboard and some Kentucky Fried Chicken sacks.  Lemons also revealed that, after searching the vehicle, he and Carr removed Haynes from the squad car and examined his mouth.

The testimony of three independent witnesses, Justis and Haynes contradicts that of George, Carr and Lemons.  Carla Vibbert, who knew of but had never been introduced to Haynes, claimed to have viewed the entire scene outside of Justis' apartment on the day that Haynes was arrested.  Vibbert saw the officers enter the apartment, only to have one of the officers exit the apartment and "open the car door and stuff."  Only after that did Vibbert see Haynes being escorted from the apartment.  When Haynes came outside, the officer who had been in the Firebird shut the door.  Haynes was then placed in the patrol car, and the officers resumed their search.  Vibbert did not see anything removed from the Firebird before Haynes was brought outside.

When asked how Vibbert knew that the person who first entered the car was a police officer, she replied that he was wearing a uniform.  She further identified George as that officer.  However, all of the police personnel who testified denied that George was wearing a uniform that day.  Rather, he was dressed in plain clothing.

Shannon Brandon is another independent witness who did not know Haynes at the time.  Brandon was visiting her friend, Tasha, who lived with her mother next door to Justis.  She said that, about five or ten minutes after seeing the law enforcement personnel enter the apartment, a single officer came out.  That officer, who was wearing a uniform, then opened the door of the gray Firebird and began looking around.  Thereafter, Brandon saw two officers escort Haynes

out of the apartment. Haynes was hollering something that Brandon could not understand. Brandon does not remember Haynes being patted down or the officer removing anything from his pockets before he was put into the squad car. She did, however, recall seeing the officers pull Haynes out of the squad car and examine his mouth following their search of the car.

The Tasha whom Brandon was visiting was Tasha King, who also testified at the suppression hearing, and who also did not know Haynes. King left her apartment and saw officers surrounding Justis' apartment. The officers entered the apartment. Before Haynes was brought out, one of the uniformed officers emerged from the apartment, went to Haynes' car and started searching. Haynes was brought out a few minutes later by two officers and began yelling, "What the fuck are you doing looking in my car?" After Haynes was placed in the squad car, the officers resumed their search of his Firebird. Like Brandon, King did not recall Haynes being patted down prior to being placed in the squad car, but did recall the examination of his mouth following the vehicular search.

Haynes was the final witness at the suppression hearing. He contended that "a slew" of officers, maybe five, were all crowded into the bedroom when he was discovered between the mattress and the box spring. He was handcuffed, brought to his feet and had his pockets emptied. One of the officers then said to another, "check this," at which time Haynes heard his car keys jingling. The officers next took Haynes into the hallway, where they stopped for a few minutes. Haynes does not believe that Lemons was among the officers who were escorting him from the apartment. He believes that Lemons was, instead, the officer who went out to search his car. After seeing Lemons pull his head out of the car and slam the door, Haynes asked, "What the F [are] you doing in my vehicle?" (J.A. 241) Subsequently, as Haynes was sitting in the squad car and talking to Justis, Lemons stooped down and asked him to sign a consent form. Haynes refused, stating, "F no. You don't have any cause." (J.A. 243)

think so." JA 102). He does not *say* that Haynes was patted down in the apartment. He concedes that he did not know if any keys were removed from Haynes, nor did he see any officer, especially not Carr or Lemons, depart with the keys. (JA 102-03)

The other points stated by our court in casting some doubt on the credibility of Carr and Lemons either relate to earlier events such as the entry into the house, Maj. Op. at 8-9, or are simply the variations that can be expected in any situation with vigorous and clever cross examination. It is not for this court to decide that the district judge chose unwisely in deciding to believe the main thread of the officers' account rather than that of Haynes and his witnesses.

A conflicting story line is provided by Haynes, and supported in varying degrees by several citizen witnesses. This story line is that a single officer left the house while Haynes and other officers were still inside the house. That officer went into the car, possibly using keys obtained from Haynes, and was at least partially inside the car when Haynes was brought out of the building by two police officers. By this account, Haynes reacted loudly, profanely, and negatively to the officer's presence. By his account, Haynes at no time consented to any search of his car.

On balance, Judge Todd, having had the opportunity to observe all of the witnesses, concluded that he credited the officers' accounts that Haynes had consented. It is true that the judge gave some colorful, and perhaps ill-advised under the circumstances, descriptions of the difficulties of the case, characterizing it as "trying to catch moonbeams in a jar." (JA 251) Despite the majority's reliance on this phrase (see pages 18-19), I do not read it as the judge admitting that no truthful determination could be made and thus, *a fortiori*, no conclusion as to the voluntariness of the consent. Rather, I read it as simply being a colorful way of indicating that the evidence was so conflicting that an ultimate resolution might only be possible in the mind of God, but as a judge charged

## CONCURRING IN PART, DISSENTING IN PART

BOGGS, Circuit Judge, concurring in part and dissenting in part. United States District Judge James Todd made a specific credibility finding that Haynes, the defendant in this case, had consented to a search of his car. The judge did so after having a full hearing in which he personally observed testimony by all of the potential witnesses, including the defendant himself. I believe that the district judge did not commit clear error in that factual determination, and thus I would affirm his denial of the motion to suppress the gun found in that search. I therefore respectfully dissent as to as to the contrary holding of the court. I concur in Parts III.B.1 (exigent circumstances do not support the search) and III.C (affirming refusal to suppress Haynes's statement) of the court's opinion.

As with any event testified to by a large and contentious number of witnesses, there are some contradictions between the testimony of many of the witnesses. However, two fairly clear story lines emerge from the testimony given before the district judge. The basic story line of the government is that a number of police officers found Haynes hiding in an upstairs bedroom. He was arrested and handcuffed at that point, and was escorted out of the building by Officers Carr and Lemons. When they arrived at a patrol car that was waiting in front of the building, they patted him down, found the keys to his car, and obtained his specific consent to search the car. This account is completely consistent with the testimony of Carr and Lemons, and is not specifically contradicted by any of the testimony by the other police officers.

Officer George, whose testimony is cited as contradictory to Lemons and Carr, Maj. Op. at 4, is simply not contradictory. He indicates that he merely assumed that a pat down would have been done in the apartment. ("I would

At the hearing, Justis supported Haynes' testimony. She said that one of the officers asked Haynes to sign a consent form, and that Haynes replied by stating, "F no. I will not." (J.A. 146)

It is clear that someone at the scene did have consent-to-search forms; Corporal Terry Grooms had Justis sign one for the search of her apartment. Carr testified that, although he may have had consent-to-search forms in his car, he does not generally ask for the form to be signed before searching a vehicle. Chief Lawrence Garner testified that the police department's policy required written consent to search a residence, but not a vehicle.

Haynes also argues that the officers should have sought a warrant to search the Firebird. To support that claim, defense counsel elicited testimony from George that he had never had any difficultly securing a search warrant from the general sessions judge in a period of less than thirty minutes.

Eventually, Haynes was taken to the police department. There, he signed a Waiver of Rights form that recited his *Miranda* rights and stated:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure-or-coercion of any kind has been used against me.

This is the first indication in the record of Haynes' being informed of his *Miranda* rights.[2]

In the recorded statement to George that followed, Haynes again agreed that he had been advised of his constitutional rights, understood those rights, had not been promised anything or threatened before making the statement. Haynes

---

[2] *Miranda v Arizona*, 384 U.S. 436 (1966).

acknowledged ownership of the .357 Magnum, saying that he "came by" that and the jewelry that was found in the car. He said that he bought the car from a lot, with cash, although it was registered in his daughter's name. The small amount of marijuana found in the car also belonged to Haynes. The statement also addressed Haynes' pawning of jewelry in Kentucky. Although his daughter had pawned some of the items of jewelry under her name, she did not suspect that they were stolen. Justis was never with him when the items were pawned.

During the suppression hearing, Haynes claimed that, before the tape recording started, George threatened to involve Haynes' daughter and Justis if Haynes did not give the statement. Specifically, George allegedly warned that he would have to arrest Haynes' daughter since the car was registered to her, and that Justis was harboring a criminal.

George denied using any threats or coercive actions to compel Haynes to give the statement. Lemons, who witnessed the statement, agreed that George did not say anything threatening to Haynes.

Another topic covered in the hearing addressed how the police department gained entry into Justis' apartment. Although Haynes does not challenge the legality of the officers' entry into and search of the apartment, he argues that the officers' testimony regarding their entry into Justis' apartment raises questions with respect to their credibility.

Lieutenant Kelly indicated that, after he and Captain Vastbinder knocked at the apartment door, a white woman answered. Kelly and Vastbinder told her who they were looking for. She then pointed in the direction of the bedroom and backed up, allowing them into the house. Kelly stated that although he had his gun drawn as he approached the apartment, they did not enter the apartment until they identified themselves and let the woman know what they were doing there. Only later did Kelly find out that the woman answering the door was not Justis, but was a neighbor, Tammy Clark.

As such, the Court affirms the denial of Haynes' Motion to Suppress with respect to the statement at issue.

## IV.   *Conclusion*

For the foregoing reasons, the Court **REVERSES** the district court's denial of Haynes' Motion to Suppress with respect to the evidence seized from the Firebird, but **AFFIRMS** the denial with respect to the statement.

307 (1985). Where a confession is alleged to have been involuntary because of some element of police coercion, the defendant's due process rights are implicated, and the appellate review of the claim is *de novo*. *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991).

"An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994). Unconstitutional coercion may be mental as well as physical. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991).

> In determining whether a confession has been elicited by means that are unconstitutional, this court looks at the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.' Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

*Ledbetter*, 35 F.3d at 1067.

Here, Haynes has not analyzed the factors relevant in determining whether his statement was coerced. The evidence in the record suggests that an analysis of these factors does not weigh in his favor. Haynes was forty-three years old at the time of his arrest, was advised of his constitutional rights and admitted to having ample experience in the criminal justice system. The alleged threats to investigate Justis and Haynes' daughter were not of such a gravity that an ordinary person, much less someone of Haynes' age and experience, would have lost the will to resist.

Contrary to Kelly's testimony that Clark willingly let the officers into the apartment, Clark testified that she opened the door and backed up because there were two guns pointed in her face; the officers forced her back into the apartment. However, even if Kelly lied about the manner in which the officers gained entry into Justis' apartment, his credibility is not germane. Kelly's alleged lack of credibility sheds no light on whether George, Carr or Lemons lied about the Firebird being searched with Haynes' consent.

More pertinent is George's testimony. He stated that he assumed that the woman who opened the door for him was Justis, but he later saw Justis and learned who she was when she was being questioned by Kelly at the police department. Although George should have then realized that the woman who opened the door was not Justis, he later filled out his report indicating that Justis answered the door.

Lemons' credibility was also impeached. He was asked if he had testified in an earlier proceeding that he was one hundred percent certain that the woman who opened the door was Justis. Lemons replied that he had only testified that the woman "looked like" Justis. Haynes' attorney read from a transcript where Lemons had been asked, "How sure are you that Janice Justis opened the door when you arrived?" Lemons replied, "A hundred percent."

Following the July 2, 1999 suppression hearing, the district court denied Haynes' Motion to Suppress. The court acknowledged that a group of citizens gave testimony that was "entirely different" from the police officers, and concluded, "It seems clear that somebody went into the car while Mr. Haynes was still in the house . . . ." Nevertheless, the court found that, if Haynes later gave verbal consent to the search, that consent would vitiate the bad search that had previously taken place. Ultimately, the district court concluded that Haynes did give consent, but only after acknowledging that "finding the truth in this one is sort of like trying to catch moonbeams in a jar because there are so many different accounts of what happened."

To find that Haynes consented, the district court relied upon the statement Haynes gave to the police. He reasoned that, had Haynes' car been searched without his consent and against his express wishes, he would not have given the statement in such a conciliatory and cooperative tone. Further, the district court found Haynes' testimony lacked credibility. In doing so, he relied upon Haynes' testimony that he kept a handcuff key on his key ring because it had belonged to his father. Haynes asserted that the key was the only thing he ever had that belonged to his father. The district court had a hard time believing that Haynes kept the key as a family heirloom and, thus, found Haynes' entire testimony incredible.

The district court additionally concluded that, even if Haynes had not consented, the officers had a sufficient basis to search the car under *Carroll v. United States*, 267 U.S. 132 (1925) and *Chambers v. Maroney*, 399 U.S. 42 (1970).

### III.    *Discussion*

#### A.    *Standards of Review*

"On suppression issues, we review a district court's findings of fact for clear error, but we review all conclusions of law *de novo*." *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). In this appeal of Haynes' Motion to Suppress, the Court must consider the evidence in the light most favorable to the government. *United States v. Shamaeizadeh*, 80 F.3d 1131, 1135 (6th Cir.1996).

#### B.    *Search of the Firebird*

The district court found that an officer had searched Haynes' car before he came outside; that Haynes' consented to the second search; that the consent for the second search vitiated the first bad search; and, that exigent circumstances also justified the search of Haynes' car. If the latter proposition is upheld – if exigent circumstances justified a search – then neither the first nor the second search required Haynes' consent.

at 828.[10]  Notwithstanding, given the rapid succession of events from the time that Haynes was discovered in his hiding place to the time that Carr told him that the officers "needed to check the car," the Court is not convinced that Haynes' acquiescence represented "unequivocal, specific and intelligently given consent." *Tillman*, 963 F.2d at 143.

Of additional relevance is the fact that Haynes witnessed the initial illegal search of his car and, according to the witnesses, shouted his objection when he exited the apartment. When Carr stated that the officers needed to check his car, Haynes may have reasonably believed that the horse was already out of the barn. *Furrow*, 229 F.3d at 814. And, Haynes' concern that his daughter could be implicated with whatever had already been discovered in his car could have further influenced him to cooperate with the search and take full blame.

These factors lead this Court to conclude that, even if the district court had correctly credited the officers' testimony that Haynes gave oral consent, the Government has not demonstrated that the consent alleged was sufficiently an act of free will to purge the taint of the first illegal search.

#### C.    *The Statement*

In his Motion to Suppress, Haynes further argued that the statement he gave to George following his arrest should be suppressed. He argued that George coerced him into waiving his *Miranda* rights and to giving the statement by threatening to take legal action against Justis and Haynes' daughter. The Fifth Amendment prohibits a prosecutor from using compelled testimony. *Oregon v. Elstad*, 470 U.S. 298, 306-

---

[10]The fact that the defendant in *Watson* was not "a newcomer to the law" was one factor that led the Court to hold that the consent at issue was voluntary. *Watson*, 42 U.S. at 425-26. Unlike here, however, the *Watson* defendant had been given his *Miranda* warnings and informed that the results of the search could be used against him. *Id.* at 426. These warnings were also considered relevant to the *Watson* court. *Id.*

district court's finding that the consent was not unequivocal, specific and intelligently given. *Id.* Of additional significance was the content of the statement that the Government argued constituted consent. The *Worley* defendant, who had been asked to consent to the search of his bag during an investigative stop at an airport, responded, "'You've got the badge, I guess you can.'" *Id*. at 384. We upheld the district court's finding that the defendant's statement represented an act of futility arising out of his belief that he had no choice but to comply. *Id.* at 386.

A suspect's knowledge of a prior illegal search can also give rise to a sense of futility. As explained in *United States v. Furrow*, 229 F.3d 805, 814 (9th Cir. 2000), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001):

> In *Howard*[8] and *Suarez*,[9] for example, the party who offered consent to a search had witnessed the illegal entry. The consent, although perhaps voluntary, was a product of the antecedent constitutional violation. In such a case, a person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out. (footnotes added)

Applying the foregoing principles to this case, we hold that the facts do not demonstrate by clear and positive testimony that Haynes' alleged consent, if given, was sufficiently voluntary so as to remove the taint of the prior illegal search of his vehicle. Prior to his alleged consent, Haynes had not been advised that he could refuse to consent to the search or of his *Miranda* rights. It is true that Haynes was not a "newcomer to the law." *Watson*, 423 U.S. at 424-25, 96 S.Ct.

---

[8] *United States v. Howard*, 828 F.2d 552 (9th Cir. 1987).

[9] *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir.1990).

This Court's analysis, therefore, begins with the question of whether exigent circumstances justified the searches. We conclude that they did not because the officers did not have probable cause to search the car. Haynes' consent was, thus, necessary to justify the search. For the reasons stated below, we additionally conclude that the Government failed to demonstrate by clear and positive testimony that Haynes consented to the second search and that, even if he did, that consent did not vitiate or remove the taint of the first bad search.

### 1.    Did exigent circumstances support the search of the car?

The Government has the burden of proof to justify a warrantless search. *See United States v Pollard*, 215 F.3d 643, 648 (6th Cir. 2000) (finding that the government bears the burden of proving exigent circumstances exist.). In this case, the district court agreed with the Government that exigent circumstances justified the search. This Court finds otherwise because probable cause to search the Firebird was lacking.

As a general rule, the Fourth Amendment prohibits searches without a warrant except when the search is conducted with consent or under certain exigent circumstances. *See Florida v. Royer*, 460 U.S. 491, 497 (1983). The Supreme Court has identified the mobility of automobiles as creating an exigent circumstance. "The mobility of automobiles, we have observed, 'creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible.'" *California v. Carney*, 471 U.S. 386, 391(1985)(quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)).

More recently, in *Pennsylvania v. Labron*, 518 U.S. 938 (1996),[3] the Court relied upon *Carney* to reverse the holdings of the Pennsylvania Supreme Court in two cases. In each case, the Pennsylvania court suppressed evidence found during vehicular searches reasoning that, although they were supported by probable cause, the warrantless searches were not justified by exigent circumstances. To reject those holdings, the *Labron* Court reemphasized that the ready mobility of a motor vehicle is, in and of itself, "an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear." *Id.*, 518 U.S. at 940. Consequently, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Id.*

Moreover, a search of an automobile may be conducted without a warrant even if it is not readily mobile. "Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Carney*, 471 U.S. at 391. The lesser expectation of privacy derives "from the pervasive regulation of vehicles capable of traveling on the public highways." *Id.* at 392.

> In short, the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.

*Id.*, 471 U.S. at 391.

As a result of the foregoing, Haynes' argument that the officers should have secured a warrant is unavailing. His

---

[3] *Labron* and *Carney* are part of the progeny of the opinions on which the district court relied – *Carroll* and *Chambers* – to find that the search of the vehicle was justified even if Haynes did not consent.

examine the effects of the prior illegal search of Haynes' vehicle. When consent follows an illegal search, the Government must demonstrate that the "consent was '*sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" *Buchanan*, 904 F.2d at 355, (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975)(emphasis in original)).

In *Calhoun*, this Court held the defendant's voluntary consent to search removed the taint of the initial illegal sweep of her home. In so finding, we emphasized the fact that the defendant had been read her *Miranda* rights and had signed a consent form before the second search. The consent form informed the defendant of her right to refuse to consent to the search. This satisfied "a key test of the validity of a consent to a search given by a person in custody," which "is whether the person was informed consent could be refused." *Calhoun*, 49 F.3d at 235 n.4.[7]

Likewise, in *United States v. Worley*, 193 F.3d 380, 386-87 (6th Cir. 1999), this Court considered the Government's failure to inform the defendant of his right to refuse consent when analyzing the totality of circumstances. The lack of notification was one factor that led the court to uphold the

---

subtle forms of coercion that might flaw [an individual's] judgment.' *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).
*Ivy, 165 F.3d* at 402.

[7] The *Calhoun* court derived this "key test" from a dissent by Justice Douglas, at 419 U.S. 979, 981-82 (1974), to the order denying certiorari in *United States v. Gentile*, 493 F.2d 1404 (5th Cir.), and a dissent by Justice Marshall in *United States v. Watson*, 423 U.S. 411 (1976). It is noted that the majority in *Watson* held that the absence of proof that a custodial suspect knew he could withhold consent should not be given "controlling significance." *Watson*, 423 U.S. at 424. Notwithstanding, the Court indicated that such lack of knowledge is a factor in adjudging the totality of circumstances. *Id.* Further, when finding that the defendant's consent was sufficiently voluntary, the Court found it relevant that the defendant had been given his *Miranda* warnings and cautioned that the results of the search could be used against him. *Id.*, at 425.

(quoting *United States v. Vasquez*, 638 F.2d 507, 528 (2nd Cir. 1980)).

In this case, virtually no time had elapsed between the first and second search of the car, and the parties involved never left the scene during that time period. Hence, the only question is whether an intervening event dissipated the taint.

The district court held that Haynes consented to the search of his car. Under some circumstances, a voluntary consent to search is an event that may remove the taint of a prior illegal search. *See, e.g., United States v. Calhoun*, 49 F.3d 231 (6th Cir. 1995). "Consent must be proved by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Although it did not explicitly analyze whether Haynes' alleged consent was voluntary, the district court did consider Haynes' experience with the criminal justice system and lack of rough treatment in holding that he had consented to the search. These are relevant factors for assessing whether consent was voluntarily given. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998).[6]  Yet, the district court did not

---

[6]The *Ivy* court outlined the factors that must be considered under the totality of circumstances test as follows:

First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *See United States v. Jones*, 846 F.2d 358, 360 (6th Cir.1988). Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, *see Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2059; and indications of 'more

---

vehicle was readily mobile and, even though Haynes was in custody, could have been driven away by someone else. The officers may have been able to prevent anyone else from taking off with the Firebird by effectively seizing it. But there is no distinction, for constitutional purposes, between seizing a car and searching it. *Chambers*, 399 U.S. at 51-52. Furthermore, even if the Firebird was not readily mobile, the lesser expectation of privacy in automobiles is an accepted justification for searching without a warrant, provided that there is probable cause.

Thus, the question at hand is whether the search of Haynes' car was supported by probable cause. A district court's finding of probable cause is a legal conclusion that must be reviewed *de novo*. *United States v. Padro*, 52 F.3d 120, 122 (6th Cir. 1995).[4]

We define probable cause as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.' *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990). Probable cause exists when there is a '"fair probability that contraband or evidence of a crime will be found in a particular place."' [U.S. v. Wright, 16 F.3d 1429, 1437 (6th Cir.1994)] (*quoting Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Determining whether probable cause existed at the time of the search is a '"commonsense, practical question" to be judged from the "totality-of-the-circumstances."' *Id.* (*quoting Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2338, 76 L.Ed.2d 527 (1983)). In determining whether probable cause exists, we may not look to events that occurred

---

[4]The district court did not explicitly address the issue of whether the officers had probable cause to conduct their search of Haynes' vehicle. However, it's conclusion that the officers had a sufficient basis to search the car under *Carroll* and *Chambers* suggests that it found probable cause to exist. Both opinions made clear that probable cause was required in order to justify warrantless searches. *Carroll*, 267 U.S. at 158-59; *Chambers*, 399 U.S. at 48-49.

after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search. *See United States v. Ferguson*, 8 F.3d 385, 391-92 (6th Cir.1993)(en banc).

*Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998).

In this case, looking at the objective facts known to the officers at the time of the search, a fair probability that contraband would be found did not exist. George had been informed that Haynes was suspected for stealing firearms and jewelry, but none of the officers had been given any information that would lead to any more than a mere suspicion that Haynes stored those articles in his car. *Compare Wyoming v. Houghton*, 526 U.S. 295, 297-298 (1999) (finding that the occupant of stopped vehicle had hypodermic needle in plain view that he acknowledged he had used for drugs); *Labron*, 518 U.S. at 939 (finding that the respondent seen transacting in drugs taken from the trunk of car); and *Chambers*, 399 U.S. at 44 (vehicle matched that seen leaving the scene of a robbery, and clothing of the occupants matched that of the robbers).

Under similar circumstances to the instant case, the Tenth Circuit recently held that the police lacked probable cause to search the car at issue. In *United States v. Edwards*, 242 F.3d 928 (10th Cir. 2001), the police arrived at a bank after one of its employees tripped the silent alarm. They found the defendant and his girlfriend standing in front of the bank with an open camera bag with $2000 in plain view. 242 F3d at 931. Red smoke came from the bag, evidence of an exploded red dye pack.[5]  Id.   As it turned out, the Hollywood, California bank the defendant was found standing in front of was not robbed; the cash had come from a robbery in Boulder, Colorado. Id at 932. A subsequent search of Edwards' rental

---

[5]As explained by the *Edwards* court, dye packs are distinguished as packs of currency and are triggered when unsuspecting robbers attempt to take their booty through magnetic fields at bank doors. *Edwards, 242 F.3d* at 931 n.2.

### 3.   Was the taint of the first search removed by Haynes' alleged consent to the second search?

The final question is, if Haynes did verbally consent to the second search, whether that consent would vitiate or remove the taint of the first, and unquestionably illegal, search of Haynes' car. We find that it would not.

The district court opined that the bad search of Haynes' car was vitiated by his subsequent consent.

If he gave consent to search that car, then that would vitiate any bad search that had taken place previously. Even if someone had gone into the car and looked without consent and then Mr. Haynes later consents, then that vitiates the bad search.

We disagree with the district court, but whether the consent vitiated the first illegal search is not really at issue. It is the second search that the Government is attempting to justify. Having decided that Haynes gave oral consent after the first search, the pertinent query before the district court was whether that consent removed the taint of the illegal search and validated the second search. The district court never engaged in that crucial analysis.

To determine whether the taint of the illegal search was removed by Haynes' alleged consent, this Court must apply the "independent source" doctrine. "This 'independent source doctrine' deems evidence admissible in those situations where an illegal search takes place at some point during a criminal investigation, but where a proper, independent search led to the evidence in question." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000). The doctrine rests "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Murray v. United States*, 487 U.S. 533, 542 (1988). "Dissipation of the taint resulting from an illegal entry 'ordinarily involves showing that there was some significant intervening time, space, or event.'" *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990),

known that that search had taken place, despite their testimony to the contrary at the suppression hearing.

It is further noteworthy that neither Brandon nor King recalled seeing Haynes patted down upon his exit from the apartment. Yet, they both recalled seeing the officers examine Haynes' mouth following the vehicular search. In the face of their otherwise detailed testimony, the fact that neither Brandon nor King recalled the alleged pat down suggests that it took place inside the apartment, contrary to Carr's and Lemons' testimony.

With respect to the district court's reliance on the later statement given by Haynes to establish consent, this Court finds that by the time that Haynes cooperatively gave the statement and expressed an interest in protecting his daughter, the weapon and contraband had already been found. Haynes' desire to protect his daughter would not necessarily have led him to cooperate *before* the search that revealed those items.

It may be, as the district court found, that Haynes consented to the search of his car after it had already begun. Nonetheless, as the foregoing makes clear, and particularly given the testimony of independent witnesses and the inherent incredibleness in Carr's and Lemons' testimony, the Government has failed to sustain its burden of proof to demonstrate, through clear and positive testimony, that valid consent was obtained. The district court acknowledged as much when it stated that "finding the truth in this one is sort of like trying to catch moonbeams in a jar because there are so many different accounts of what happened."

In short, the district court's reasons for sorting out the contradictory testimony in the manner it did were insufficient to overcome the lack of clarity in the Government's presentation of evidence. Finding the truth in this matter continues to be like catching moonbeams in a jar, and the Government has failed to demonstrate by clear and positive testimony that Haynes consented to the search of the Firebird.

car revealed bags full of dye-covered currency which was bundled together with Federal Reserve wrappers from the bank in Boulder. Id.

Although the *Edwards* court concluded that the police had probable cause to arrest the defendant, it held that probable cause was lacking to search the car in which the defendant and his girlfriend were seen arriving at the bank. The court reasoned:

> Edwards and Dittrich were not arrested in or near the vehicle and, although they were carrying what appeared to be contraband in Dittrich's camera bag, there was no testimony presented at the suppression hearing that would support a belief by the police that additional contraband or evidence could be found in the vehicle. Furthermore, by the time the police decided to search the rental car, the police were aware that the City National Bank had not been robbed, making it even less likely that traditional tools of robbery (such as guns or disguises) might be found in the vehicle. In short, we see no evidence from which the police could have deduced a 'fair probability' that a search of the car would reveal contraband or further evidence of criminal activity.

*Edwards*, 242 F.3d at 939.

Likewise, in this case, Haynes was not arrested at or near his car and there was no testimony at the suppression hearing from which the police could deduce a fair probability that a search of the Firebird would reveal contraband or evidence of criminal activity.

Consequently, the Court finds that the police officers lacked probable cause to search the Firebird without Haynes' consent.

### 2.    Was there consent to the second search?

After crediting Carr's and Lemons' testimony, the district court additionally found that Haynes consented to the second

search of the Firebird.  When, as here, it is alleged that the defendant consented to the search, "[i]t is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) (quoting *United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir. 1978)).  "Whether consent to a search is voluntarily given is a question of fact."  *United States v. Erwin*, 155 F.3d 818, (6th Cir. 1998).  Hence, a trial court is given wide latitude to assess the credibility of witnesses. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985).  Nonetheless, the court's discretion is not unlimited.  A trial court's decision to credit a witness' testimony may be held erroneous on review if "[d]ocuments or objective evidence . . . contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id., 470 U.S. at 575.*

To justify its conclusion that Haynes consented to the search after it had begun, the district court relied upon the cooperative and conciliatory manner in which Haynes later gave his statement.  The district court noted that Haynes appeared to be motivated by a desire to protect his daughter from being implicated with any of the items found in the car. The district court additionally discredited Haynes' testimony because it did not believe that the handcuff key was a keepsake from Haynes' father.  Thus, it appears that one apparent inconsistency, on a rather collateral matter, tainted Haynes' entire testimony.  This same logic was not used on Carr and Lemons, whose testimony the district court believed on the issue of consent.  And, the court chose to credit Carr's and Lemons' testimony on the issue of consent to the second search, even though the court also found quite clearly that "somebody went into the car while Mr. Haynes was still in the house."  This finding was based on the testimony of the independent witnesses and was completely contrary to Carr's and Lemons' testimony.  Despite the fact that the district court did not believe Carr's and Lemons' adamant testimony that the car  was not searched before Haynes was brought

outside and consented to the search, which was the central issue, it nonetheless expressly credited Carr's and Lemons' testimony that Haynes consented to the search.

The Court finds that the district court clearly erred in crediting Carr's and Lemons' testimony that Haynes verbally consented to the second search of his Firebird.  As noted, the district court is given wide latitude to assess the credibility of the witnesses.  Therefore, the district court's determination that Haynes' vehicle was searched before he was brought outside leads to the inevitable conclusion that Carr's and Lemons' entire testimony should be called into question. Contrary to the district court's findings, both Carr and Lemons testified that Haynes' car was searched only after he was brought outside.  And, it is implausible that Carr and Lemons testified truthfully to their knowledge, but were simply unaware that an officer had searched the car prior to Haynes being brought outside.

Their lack of credibility is established by their own testimony, which was that  the keys to the Firebird were not even found until Haynes was brought outside.  Carr testified that he used the key to open Haynes' locked car door.  Hence, Carr's and Lemons' testimony limits the possibility that someone could have searched the car while they and Haynes were still inside, unbeknownst to them, and then locked the car doors before they brought Haynes outside.

Secondly, by finding that the car had been searched prior to Haynes being brought outside, the district court must have credited the testimony of the independent witnesses.  Their testimony undermines the credibility of Carr and Lemons in significant respects.  Consistent with Haynes' testimony, Tasha King testified that Haynes hollered his objection to the search of his car as he exited the apartment.  Shannon Brandon also heard Haynes yelling something in response to seeing the officer in his car.  Thus, even if another officer had managed to get into Haynes' car without the keys and without Carr's and Lemons' knowledge, Carr and Lemons would have learned that when they left the apartment; they would have