**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:  05a0499n.06**
**Filed:  June 10, 2005**

**No. 04-5896**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DARRELL CRAIG CLARK, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  SILER and SUTTON, Circuit Judges; O'MEARA, District Judge.[*]

SUTTON, Circuit Judge.  In pleading guilty to one count of possession of an unregistered firearm, 26 U.S.C. § 5861(d), and two counts of possession of a firearm after being convicted of a misdemeanor crime of violence, 18 U.S.C. § 922(g)(9), Darrell Craig Clark reserved the right to appeal the denial of his motion to suppress evidence discovered when officers searched his home. While Clark has properly retained the right to bring this Fourth Amendment challenge, it remains a difficult hand to play.  Clark must establish that the district court committed clear error in crediting the testimony of three officers who all stated that Clark and his mother explicitly consented to the search.  As we find no clear error in this credibility determination, we affirm.

---

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

No. 04-5896
*United States v. Clark*

The relevant facts were developed at Clark's detention hearing (on March 11, 2004) and at his motion-to-suppress hearing (on March 25, 2004). Acting on an informant's tip, Officers Steven Isaacs and Richard Muse, both of the Kentucky Department of Fish and Wildlife, sought to question Clark about his involvement in a deer poaching incident. They encountered Clark at property owned by his mother, Irene Clark, that contained two residences, one of which was occupied by Clark. Upon driving their marked trucks onto the property, Clark did not greet them warmly. He drove his truck toward Muse's vehicle, eventually "scuffled" with Muse, JA 81, 85, then ran into the house, all the while refusing commands to stop. After he emerged from the house, Clark told the officers to leave the property. When that did not work, Clark tried to get into his truck to leave the property himself, at which point the officers handcuffed him. Officers later found a loaded nine-millimeter handgun on the passenger's seat of Clark's truck.

Within ten to fifteen minutes after the officers handcuffed Clark, Clark's mother, Irene, arrived at the scene, as did additional officers responding to Isaacs' request for assistance. The officers moved Clark to the back of Kentucky State Trooper Ryan Loudermilk's cruiser. Isaacs told Clark's mother that they were looking for a weapon that had been used in a poaching incident. She responded that she owned the property and that she "didn't have a problem" with the officers searching the home. JA 132–33, 152. The officers then asked her to determine whether Clark himself would permit them to search the home. In response, according to Isaacs, Clark said something to the effect of "I don't have anything to hide—yeah, go ahead." JA 134, 152–53.

Another responding officer, Sergeant Joe Rush of the Rockcastle County Sheriff's Department, also testified about the Clarks' consent to search. He testified that Clark's mother said that she "didn't have a problem" with the officers searching the house. JA 160. And when Clark was asked if the officers could search the house, Rush heard Clark say "I don't have nothing to hide." *Id.*

Special Agent Thomas Chittum of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who was not at the scene, testified that Isaacs and Muse "explained the whole scenario to [him], including how consent was granted," JA 166. Chittum stated that he asked Loudermilk whether Clark gave consent, and Loudermilk responded that "he had heard Mr. Clark also grant consent to search the residence." *Id.* *See* Fed. R. Evid. 104(a); *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979) (holding hearsay evidence admissible in a suppression hearing).

Upon searching the house, the officers found an H&K 91 rifle that fit the caliber of shells found at the scene of the poaching. They also found a "sawed-off" shotgun, a .22 caliber rifle with an obliterated serial number and a derringer pistol. In addition to the guns, the officers found marijuana in the kitchen. When the officers brought the marijuana out of the kitchen, Clark's mother asked the officers to leave, at which point they left "immediately." JA 137.

The officers later determined that Clark had a prior misdemeanor conviction for domestic violence and accordingly obtained a warrant to arrest him. When Clark came to the Kentucky

Department of Fish And Wildlife office to retrieve his firearms, officers arrested him. They also found three additional firearms in the truck that he had driven to the office.

At the motion-to-suppress hearing, Clark's mother testified to a different sequence of events. She said that she never gave the officers consent to search the house. And when she told Clark that the officers wanted to search the house, she testified that Clark "screamed—said they are not to go in my house, and there's no way that nobody didn't hear him. . . . [H]e said, would you tell them SOB[s] to not go in my house. And I attempted to lock my door. . . . They was right behind me and just went right in my house, and I couldn't stop them." JA 172.

The magistrate concluded that the officers' testimony was "fully credible," JA 60, noting that the testimony of Isaacs and Rush, who were at the scene, was "straightforward, detailed, and consistent in all major respects." *Id*. The magistrate also noted that Chittum "testified that [he] had inquired about the incident and had personally spoken with at least three of the officers who were present at the scene. He testified that all three officers had indicated to him that the defendant and his mother had both verbally consented to a search of the residence." *Id*. The magistrate found Mrs. Clark's testimony "highly improbable," JA 61, noted her motive to help her son and found her testimony "unclear or confused on many facts." *Id*. In addition, the magistrate concluded that "it reasonably appeared to the officers that [Mrs. Clark] had apparent authority to allow them to enter the [residence]," JA 58–59, and "[t]here is no question that the defendant, as a current resident of the [house], had authority to give consent to search." JA 59.

On April 15, 2004, the district court adopted the magistrate's report and recommendation, giving "significant weight" to the magistrate's credibility determinations because the magistrate had "listened to the testimony presented at the hearing." JA 68. On July 13, 2004, Clark pleaded guilty to the charges against him, though he reserved the right to challenge the district court's suppression ruling. The district court sentenced him to 87 months of imprisonment and three years of supervised release.

II.

In examining a district court's ruling on a motion to suppress, we review its legal determinations de novo and its factual determinations for clear error. *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003). Where the district court has denied the motion to suppress, "the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). "[F]indings of fact anchored in credibility assessment[s] are generally not subject to reversal upon appellate review," *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998), because "when there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous," *id*. at 401–02. "Nonetheless, the court's discretion is not unlimited." *United States v. Haynes*, 301 F.3d 669, 679–80 (6th Cir. 2002). "A trial court's decision to credit a witness' testimony may be held erroneous on review if . . . the witness' story . . . itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id*. at 679–80 (quotations and brackets omitted).

On appeal, Clark does not challenge any of the district court's legal determinations. He instead brings a rifle-shot challenge to the court's credibility determination. "The [d]istrict [c]ourt," he argues, "clearly erred in determining that the testimony of several police officers was more credible than that of . . . Clark's mother on the issue of whether Clark and/or his mother did or did not give consent for a search of Clark's residence." Clark Br. at 12. We disagree.

The magistrate, whose credibility determination the district court accepted, heard consistent testimony from two officers (Isaacs and Rush) who each heard Clark and his mother give consent to search the house. The magistrate also heard testimony from a federal agent who said that three officers (Isaacs, Muse and Loudermilk) told him that consent was given to search the house. The only conflicting testimony regarding the consent statements came from Clark's mother, who had a plausible reason for fabricating a different sequence of events in order to protect her son.

In an attempt to establish that the officers' testimony could not reasonably be credited, Clark points to the following alleged inconsistencies in the testimony:

> * While Isaacs stated that he received a tip from a neighboring landowner, he could not remember the landowner's name on cross examination, then later said that the landowner's tenant actually gave him the tip.
>
> * At the detention hearing, Isaacs testified that he first went to Clark's residence to avoid driving "to the other side of the county" to talk to another individual implicated by the tip, but on cross examination at the suppression hearing he stated that he tried to locate the other individual before talking to Clark.
>
> * At the detention hearing, Isaacs testified that he did not believe anyone was home at the first residence but that someone was performing interior work on the second residence. But at the suppression hearing, he said that he did not believe anyone was

living at the first residence, and he did not think there were any lights on at the second residence.

* Isaacs stated at the detention hearing that he arrested Clark for assaulting Muse, but the citation lists Muse as the arresting officer and Isaacs as a witness.

* While Isaacs stated in the detention hearing that the assault charge was based on Muse's allegation that Clark pushed him, the citation does not include any allegations of pushing but instead notes that Clark attempted to get back in his truck so that he could obtain his loaded nine-millimeter handgun.

* At the suppression hearing, Isaacs first testified that he did not ask Clark to sign a consent-to-search form because he "didn't think to do it," JA 155, but then added that he had asked for consent to search from suspects in the past and that he did not know whether Loudermilk had any consent-to-search forms with him.

* Isaacs testified at the detention hearing that he did not recognize Clark's mother in the courtroom, explaining that it was dark at the scene and that he interacted with her only for a couple of minutes.

* Isaacs repeatedly testified that the H&K 91 rifle found in Clark's residence matched the 7.62-millimeter empty shell casings found at the deer poaching scene, but the caliber of the H&K 91 rifle is .308 inches.

* Isaacs' testimony conflicted with Rush's testimony as to which officer was told by Clark's mother to leave the house and which officer subsequently told the other officers to leave the house.

* Chittum's discussions with the other officers "has the appearance of a wonderful opportunity for all of the officers to make sure they all testified the same way." Clark Br. at 21.

Some of this, it may be true, establishes inconsistencies in Isaacs' testimony. But the inconsistencies relate to collateral facts; they do not undermine his consistently material testimony—during both the detention and suppression hearings—that Clark and his mother gave consent to search Clark's house. The only alleged inconsistency relating to the consent statements concerns Clark's claim that Isaacs changed his story when asked why he did not ask Clark to sign a consent-to-search form. But no change of testimony occurred. Isaacs first stated that he "didn't think to do it," JA 155, then answered that he could not "speak for Officer Loudermilk" as to

whether Loudermilk had any consent forms with him.  But these two statements establish nothing more than the fact that Isaacs, perhaps unwisely, simply "didn't think to" ask Clark to sign a consent-to-search form.  One of the other allegations about Isaacs' testimony, it bears adding, does not even establish an inconsistency, material or not.  As the government points out in its brief, 7.62 millimeters is essentially the equivalent of .308 inches, and many people use both calibers interchangeably.  United States Br. at 9.  The magistrate in the end did not commit clear error in choosing to credit Isaacs' testimony as to the consent statements, and accordingly neither did the district court.

Even if we were to conclude that Isaacs' testimony could not reasonably be credited, however, we still would be left with the unchallenged testimony of two other officers:  Rush, who consistently stated that he heard both statements, and Chittum, who consistently stated that Isaacs, Muse and Loudermilk all told him that they personally heard the Clarks give their consent to the search.  The only attempt to discredit Rush is the claim that his testimony and Isaacs' differed over which officer was told by Clark's mother to leave the house and over which officer in turn told the other officers to leave the house.  Not only does this claim fail to establish an internal inconsistency in Rush's testimony but the alleged inconsistency is immaterial to boot.  The salient point is that Clark's mother eventually told the officers to leave the house, and they in fact did so.  Nor can we accept Clark's argument that the *consistency* of the three officers' testimony is itself a liability because it proves a conspiracy to lie about the encounter, as opposed to proving that the testimony was more credible than the testimony of Clark's mother.  That of course could always be said of

consistent police officer testimony, and accordingly it generally will be the case that the first-hand observer of that testimony rather than an appellate court reviewing a cold transcript of that testimony is best positioned to credit it or call it into question. In the final analysis, because the testimony of the three officers could reasonably be credited over the testimony of Clark's mother, the district court did not commit clear error in adopting the magistrate's report and recommendation.

In a supplemental letter, Clark challenges his sentence in light of *United States v. Booker*, 125 S. Ct. 738 (2005). Recognizing that the plea agreement waived his right to appeal his sentence and recognizing that *United States v. Bradley*, 400 F.3d 459, 463–65 (6th Cir. 2005), prohibits bringing appeals in the face of such a waiver, Clark's counsel correctly withdrew this claim at oral argument.

III.

For these reasons, we affirm.