UNITED STATES, Appellee

v.

Steven L. CONKLIN, Airman First Class
U.S. Air Force, Appellant

No. 05-0220

Crim. App. No. 35217

United States Court of Appeals for the Armed Forces

Argued November 8, 2005

Decided July 27, 2006

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON and ERDMANN, JJ., joined.  BAKER, J., filed a dissent in
which CRAWFORD, J., joined.

Counsel

For Appellant:  Captain Anthony D. Ortiz (argued); Colonel
Carlos L. McDade, Lieutenant Colonel Craig S. Cook, and Major
Sandra K. Whittington (on brief); Captain L. Martin Powell.

For Appellee:  Major Mathew Ward (argued); Lieutenant Colonel
Gary F. Spencer, Major Michelle M. McCluer, Major John C.
Johnson, and Captain C. Taylor Smith (on brief).

Military Judge:  Sharon A. Shaffer

**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the "fruit of the poisonous tree" and is generally not admissible at trial.[1]  In this case we address the question of whether consent to a subsequent search is the antidote to the poison created by an earlier unlawful search.[2]  Although the subsequent consent may be a good treatment for the poison, it is not a panacea.  Here, we hold that Appellant's consent did not purge the taint of the earlier unlawful search.

We granted review of two issues presented by Appellant.[3] Because of our resolution of Issue I (unlawful search and seizure), it is unnecessary to address Issue II (the legal sufficiency of evidence).

---

[1] Nardone v. United States, 308 U.S. 338, 341 (1939).

[2] See Wong Sun v. United States, 371 U.S. 471, 488 (1963) (defining the question as whether the derivative evidence, "'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'" (quoting John MacArthur Maguire, Evidence of Guilt 221 (1959))).

[3] This Court granted review of the following issues:

    I. WHETHER THE MILITARY JUDGE ERRED IN ADMITTING EVIDENCE AT TRIAL THAT WAS OBTAINED AS A DIRECT RESULT OF AN ILLEGAL SEARCH OF APPELLANT'S PERSONAL COMPUTER.

    II. WHETHER THE EVIDENCE PRESENTED BY THE PROSECUTION AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR POSSESSING CHILD PORNOGRAPHY.

Appellant was a nineteen-year-old Airman First Class who was assigned as a student at Keesler Air Force Base, Mississippi.  He was a trainee whose room was subject to routine, random inspections by the Military Training Leaders (MTLs) assigned as supervisors of the students.  On April 26, 2001, Staff Sergeant (SSgt) Roy, an MTL, was conducting inspections.  SSgt Roy testified that, as a "Phase IV" trainee, Appellant was subject only to inspections designed to ensure that his room was neat and orderly and maintained in compliance with regulations.[4]  In conducting the "neat and orderly inspection" of Appellant's room, she inadvertently disturbed the keyboard of Appellant's personal computer causing the monitor to activate.  The "wallpaper" that was then displayed on the computer screen contained a photograph of an actress wearing a fishnet top through which her breasts were visible.  A Keesler Air Force Base Instruction[5] prohibited the "open display of pictures, statues, or posters which display the nude or partially nude human body."  SSgt Roy testified that such a picture could result in a minor "write up" for violating the base regulation.

---

[4] See Air Education and Training Command, Instr. 36-2216, Technical Training Administration of Military Standards and Discipline Training Table A2.2.14 (May 2, 2000).
[5] Keesler Air Force Base Instr. 32-6003, Dormitory Security and Living Standards for Non-Prior Service Airmen 4.2.3 (Aug. 30, 2003) [hereinafter KAFBI 32-6003].

3

Not sure what she should do, SSgt Roy contacted a senior noncommissioned officer, Technical Sergeant (TSgt) Schlegel. TSgt Schlegel had previously been involved in an inspection where he found child pornography on a computer. TSgt Schlegel testified that he had consulted with the Air Force Office of Special Investigations (AFOSI) and had been informed that it was "legal according to [the] Military Rules of Evidence" for him to examine files on a computer if he found pornography openly displayed on the computer. Following that previous guidance, TSgt Schlegel went to Appellant's room and opened and examined other files in his computer. In so doing, he found files on the hard drive showing nude pictures of females that TSgt Schlegel estimated to be between fifteen and nineteen years of age. Eventually he found a folder labeled "porn." Opening that folder, he found another folder called "Teen" that contained files of nude young females.

TSgt Schlegel and SSgt Roy then reported the results of their efforts to their commander who told them to contact the AFOSI. After being briefed by the MTLs, two AFOSI agents located Appellant at the dining facility, identified themselves to him, and asked for his consent to search his room and his computer for child pornography. Appellant gave his consent and, not surprisingly, the agents located the various images discovered earlier in the day by TSgt Schlegel. In a subsequent

4

interview with the AFOSI agents, Appellant explained that he had copied several discs which he had received from another airman. Most of the images on the discs were of adults, but some did appear to be of girls between the ages of thirteen and seventeen. He stated that he intended to delete those images, but had failed to do so.

At trial, Appellant moved to suppress the images discovered and his statements to the AFOSI agents. He argued that SSgt Roy and TSgt Schlegel went beyond the bounds of an inspection and that the actions of TSgt Schlegel were actually a subterfuge for a search. The military judge denied the motion holding that the unique training environment at Keesler Air Force Base justified more intrusive "inspections" than would be allowable in a non-training environment.

Appellant was subsequently convicted, contrary to his pleas, of possession of child pornography in violation of the Child Pornography Prevention Act of 1996 (CPPA).[6] He was sentenced to a bad-conduct discharge, reduction to the lowest enlisted paygrade, and confinement for six months.[7]

In its review of the case pursuant to Article 66,

---

[6] 18 U.S.C. § 2252A (2000).
[7] The convening authority remitted the punitive discharge pursuant to a decision of the Air Force Clemency and Parole Board.

Uniform Code of Military Justice (UCMJ),[8] the Air Force Court of Criminal Appeals disagreed with the military judge's conclusion that the activities of the MTLS were legitimate military inspections.[9]  The court below found that, although the observance of the partially nude image on the "wallpaper" was the result of a proper inspection, the subsequent examination of files located on Appellant's hard drive went beyond the scope of the inspection and became a search into an area where Appellant had a reasonable expectation of privacy.[10]  Nevertheless, the Court of Criminal Appeals determined that Appellant's subsequent consent to the search by the AFOSI agents waived his privacy interest and legitimized the subsequent search and seizure of the computer by those agents.[11]

The case now comes to us for review.  We agree with the court below that the originally lawful and proper inspection became an unlawful search when TSgt Schlegel began examining files on the computer that were not in plain view.  We next consider whether the subsequent consent overcame the taint of the previously unlawful Government conduct.  Here, we part company with the lower court and hold that subsequent consent to search is just one of the factors that goes into the analysis.

---

[8] 10 U.S.C. § 866 (2000).

[9] United States v. Conklin, No. ACM J5217, 2004 CCA LEXIS 290, at *13-*15, 2005 WL 11587, at *3-*6 (A.F. Ct. Crim. App. Dec. 30, 2004) (unpublished).

[10] 2004 CCA LEXIS 290, at *15, 2005 WL 11587, at *5.

[11] 2004 CCA LEXIS 290, at *15-*16, 2005 WL 11587, at *5.

As we examine all the relevant factors and the circumstances surrounding the law enforcement activity in this case, we conclude that the taint of the unlawful inspection is not sufficiently attenuated by Appellant's subsequent consent to search provided to the AFOSI agents.

## I. The Inspection

The initial entry into Appellant's room by SSgt Roy was a valid military inspection conducted in accordance with the applicable base regulations and the Military Rules of Evidence (M.R.E.). The base inspection program was comprehensive and reasonably directed at ensuring unit fitness and proper standards.[12] The image of the scantily clad female on Appellant's "wallpaper" was in plain view when discovered by the inspector. At this point it would have been appropriate for the inspector to secure the computer as evidence[13] of an apparent violation of the base regulation prohibiting the display of the "nude or partially nude human body."[14]

It was certainly appropriate for SSgt Roy to contact a senior, more experienced MTL for advice on how best to proceed after her discovery of the image. However, we agree with the Air Force Court of Criminal Appeals that the actions of the more

---

[12] See M.R.E. 313(b).
[13] Id. ("Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.").
[14] KAFBI 32-6003 para 4.2.3.

experienced MTL exceeded the authorized scope and purpose of the proper inspection.[15]

SSgt Roy was acting pursuant to applicable base regulations that required the inspection of dormitory rooms at least once a week to "ensure standards of cleanliness, order, decor, safety and security are maintained"[16] when she inadvertently activated Appellant's computer and noticed the wallpaper that appeared on the screen.  The regulations deal with the "plain view" situation by requiring that unauthorized items, including unauthorized pornography, "be confiscated [and] brought to the attention of the Chief MTL/MTF [Military Training Facility] Commander.[17]  The image of the partially nude woman that SSgt Roy observed was "in plain view."[18]  Her decision to report her discovery up the chain of command was fully in accordance with the inspection regime.

TSgt Schlegel determined, based on his discussions with AFOSI in a similar situation, that it was proper to open the files on the computer that was left on and that was not protected by a password.  In that similar situation, TSgt Schlegel concluded that he should treat the contents of a

---

[15] Conklin, 2004 CCA LEXIS 290, at *15, 2005 WL 11587, at *5.
[16] Dep't of the Air Force, 81 TRG Pamphlet 36-2201, Military Training, at 9 (July 5, 1999) [hereinafter 81 TRG Pamphlet 36-2201].
[17] Id.
[18] M.R.E. 316(d)(4)(C).

computer as if they were in a desk drawer and he felt free to open the files on the computer.

The desk drawer analogy is troublesome for two reasons. First, the inspection is a "neat and orderly" inspection designed to ensure standards of cleanliness, order, decor, safety and security. Opening desk drawers could be appropriate under such an inspection scheme to ensure, for example, that hazardous or unsanitary materials were not being improperly stored. It is difficult to understand, however, how opening files on a computer could serve a similar "neat and orderly" purpose. Second, even if the drawer analogy was appropriate, the regulation discusses how drawers are to be inspected. It states:

> When inspecting drawers (dresser, nightstand, desk, etc.), MTLs will check for clutter. If there is a non-transparent plastic container in a drawer or anywhere in the dorm room with small items within, it will not be opened and searched unless the owner is present. If the container is transparent and unauthorized items can be observed by sight, the container is inspectable, i.e., if a wall locker key is observed in a transparent container, a security violation has occurred.[19]

If we assume that the computer is to be treated as a drawer, we must then decide how a file on the computer is to be treated. The contents of the file are not viewable without opening the file. Indeed, the existence of the file is not viewable without taking several steps beyond the "wallpaper"

---

[19] 81 TRG Pamphlet 36-2201, at 10.

that was in plain view.  Accordingly, we conclude that, even if
the drawer analogy was appropriate, the files on the computer
should have been treated as the contents of a non-transparent
container.  Taking the drawer analogy to its logical result
leads us to the conclusion that TSgt Schlegel's actions in
opening the files went beyond what was authorized for non-
transparent containers.

The fact that the inspection exceeded its authorized
purpose and scope would not be determinative if Appellant had no
reasonable expectation of privacy in the files on his personal
computer located in his dormitory room.  In dealing with the
computer privacy question, we have held that a servicemember has
an expectation of privacy in the contents of a personal computer
in his or her home.[20]  On the other hand, we have concluded that
there is a more limited expectation of privacy in a government
computer located in a government office environment.[21]  We have
not addressed the privacy interests involved on these precise
facts:  a personally owned computer located on base in a
dormitory room that was shared with another individual.
Although we have recognized a privacy interest in assigned

---

[20] United States v. Maxwell, 45 M.J. 406, 418 (C.A.A.F. 1996).
[21] United States v. Tanksley, 54 M.J. 169, 172 (C.A.A.F 2000),
overruled in part on other grounds by United States v. Inong, 58
M.J. 460, 465 (C.A.A.F. 2003).

military dwellings,[22] we have held that "the threshold of a barracks/dormitory room does not provide the same sanctuary as the threshold of a private home."[23]

Justice Harlan, in his concurring opinion in Katz v. United States,[24] articulated what has become the test used in evaluating the question of a reasonable expectation of privacy. He concluded that there "is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"[25]

In applying that standard to this case, we conclude that Appellant did have a subjective expectation of privacy in the files stored on the hard drive of his computer and that military society would recognize such an expectation as reasonable. We therefore agree with the Court of Criminal Appeals that an individual sharing a two-person dormitory room has a reasonable expectation of privacy in the files kept on a personally owned

---

[22] United States v. Middleton, 10 M.J. 123, 132 (C.M.A. 1981) (a locked wall locker is in a zone of privacy protected by the Fourth Amendment).
[23] United States v. McCarthy, 38 M.J. 398, 403 (C.M.A. 1993) (barracks room does not afford the same protections from arrest as a private home).
[24] 389 U.S. 347, 360 (1967) (Harlan, J., concurring).
[25] Id. at 361; see also United States v. Monroe, 52 M.J. 326, 330 (C.A.A.F. 2000) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)).

computer.[26]  We next turn to that court's conclusion that,

despite the unlawful inspection, the evidence seized by the

AFOSI agents was admissible as the result of Appellant's

voluntary consent to the search of his room and computer.[27]

II.  The Consent Search and Attenuation of Taint

After TSgt Schlegel completed his unauthorized search of

Appellant's computer and its files, the MTLs contacted their

commander who told them to inform the AFOSI.  After talking with

the MTLs, two AFOSI agents and SSgt Wilcox, a third MTL present

during the inspection, found Appellant at the dining hall.[28]

Without telling him of the results of TSgt Schlegel's

examination of his computer, they requested his permission to

search his room and his computer.  He granted consent and signed

a form to that effect.  Based on this consent, the Court of

Criminal Appeals held that:

> Once the appellant gave his consent to search his
> room and his computer, he waived any reasonable

---

[26] Conklin, 2004 CCA LEXIS 290, at *12, 2005 WL 1157 at *4.  We note that the base regulations which are the basis for the inspections in this case are silent about personal computers. Accordingly, we voice no opinion today regarding a situation where regulations dealing with personal computers, barracks use, and privacy interests might exist.

[27] Conklin, 2004 CCA LEXIS 290, at *16, 2005 WL 1157 at *5.

[28] The timing of events is not clear from the record.  The AFOSI agent testified that he recalled being contacted between 0900 and 0930.  That is contradicted by TSgt Schlegel's testimony in which he recalled getting involved between 1045 and 1050. Appellant executed the consent to search form at 1230. Accordingly, it is apparent that something less than three hours elapsed from the time of the inspection to the time that Appellant was contacted by AFOSI.

expectation of privacy he might have enjoyed.  Thus, although we reach our conclusion by a different route than the military judge, we agree that the appellant was not entitled to have the evidence suppressed.[29]

Therefore, the question for this Court is whether Appellant's consent to search cured the earlier violation.  The granting of consent to search may sufficiently attenuate the taint of a prior violation.  For example, we have held that the voluntary consent to a urinalysis was not tainted by an earlier, unwarned interrogation.[30]  On the other hand, the granting of consent to search does not cure all ills.  "If appellant's consent, albeit voluntary, is determined to have been obtained through exploitation of the illegal entry, it can not be said to be sufficiently attenuated from the taint of that entry."[31]

The voluntariness of Appellant's consent is not at issue.  The only question facing us is whether Appellant's consent was an independent act of free will.  In Brown v. Illinois[32] the Supreme Court analyzed three factors to determine if Miranda[33] warnings were sufficient to remove the taint of an unlawful search and allow the admission of a subsequent confession.  The Court held that the question of whether such a confession is an act of free will must be answered on the facts of each case looking at the temporal proximity of the unlawful police

---

[29] Conklin, 2004 CCA LEXIS 290, at *16-*17, 2005 WL 11587, at *5.
[30] United States v. Murphy, 39 M.J. 486, 489 (C.M.A. 1994).
[31] United States v. Khamsouk, 57 M.J. 282, 290 (C.A.A.F. 2002).
[32] 422 U.S. 590, 603-04 (1975).
[33] Miranda v. Arizona, 384 U.S. 436 (1966).

activity and the subsequent confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.[34]  In Khamsouk,[35] we were unanimous in adopting the Brown three-pronged approach in examining the effects of an unlawful arrest upon a subsequent search, although our application of that approach was less than unanimous.[36]

The Fifth Circuit, in a case almost identical to the case we face, followed the Brown test.  "To determine whether the defendant's consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation, we must consider three factors:  (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and the flagrancy of the initial misconduct."[37]

Applying this three-prong test to the facts at hand, we determine that all three favor Appellant.  First, in terms of the temporal proximity of the illegal conduct and the consent, less than three hours elapsed between the time that TSgt Schlegel began opening files on Appellant's computer and the time that Appellant consented to the search.  Indeed, it appears that everything happened on a single day before lunch.

---

[34] Brown, 422 U.S. at 603-04.
[35] Khamsouk, 57 M.J. at 282.
[36] Indeed, the Khamsouk opinion resulted in something exceptionally unusual in this Court's jurisprudence -- five separate opinions.  Id. at 283-307.
[37] United States v. Hernandez, 279 F.3d 302, 307 (5th Cir. 2002).

Second, there were no intervening circumstances sufficient to remove the taint from the initial illegal search. Yes, different agents were involved, but they were fully briefed by the MTLs who conducted the inspection/search. Additionally, one of the MTLs involved in the initial visit to Appellant's room accompanied the AFOSI agents in their search for Appellant. Simply stated, the AFOSI agents would not have been interested in talking to Appellant but for the information relayed to them as a direct result of the unlawful search that had just taken place. There were no intervening events or circumstances that would sever the causal connection between the two searches.

Turning to the third factor in our analysis of the independent nature of the two searches, we examine the Government's conduct. Although we find no bad motive or intent on behalf of the Government agents in this case, we do find that their actions were unnecessary and unwise. TSgt Schlegel chose to expand the scope of a legitimate inspection into private files stored on a personal computer. There were a variety of legitimate options open to him. He might have secured the room and the computer and charged Appellant for the open display of the nude image. He might have presented the facts to his commander and sought search authorization or other guidance. He might have asked the advice of a staff judge advocate.

15

Although we are hesitant to call TSgt Schlegel's actions "flagrant," they were certainly unwise, avoidable, and unlawful.[38]  The actions of the AFOSI agents exploited the original illegality.  Upon being informed of the material found on Appellant's computer, they did nothing in the way of independent investigation.  Instead, they immediately sought out Appellant.  Finding him in the on-base dining facility at the noon meal, they escorted him outside and requested his consent to search.

In applying the Brown factors to the facts of this case, we return to the Fifth Circuit's analysis.  In Hernandez, a police officer felt the bag of a passenger who had boarded a bus, while the bag was in the luggage compartment underneath the bus.[39]  Feeling something suspicious, he then boarded the bus and asked the passenger for permission to search the bag.[40]  She gave consent, and he opened the bag discovering drugs inside.[41]  The Fifth Circuit noted that the first two factors of the Brown test weighed in favor of the defendant, because the consent was

---

[38] In evaluating the nature of the senior MTL's conduct in this case, we are mindful of the fact that his inspection of a personal computer on a different occasion has been the subject of appellate criticism.  See United States v. Astley-Teixera, No. ACM 35161, 2003 CCA LEXIS 246, at *27, 2003 WL 22495794, at *10 (A.F. Ct. Crim. App. Oct. 21, 2003) (a different panel of the Air Force Court facing facts virtually identical to those presented here, found the inspection unlawful and reversed).

[39] 279 F.3d at 305.

[40] Id.

[41] Id.

16

obtained immediately following the illegal manipulation of the bag and there were no intervening circumstances.[42] It concluded that the officer's conduct in manipulating the bag was not flagrant, noting that it might not have been considered a search under Fifth Circuit precedent at the time of the officer's action, but it concluded that the drugs seized were inadmissible because "the causal connection between the violation and the consent was not broken."[43]

We are confronted with a very similar situation here, and like the Fifth Circuit, we conclude that there was a causal connection between the illegal search and the act of obtaining consent. The illegal search is the only factor that led directly to the request for consent from Appellant and the subsequent search of his computer. The exploitation of the information obtained from the illegal search was flagrant even if the search itself was not. Since Appellant's consent was "obtained through exploitation of the illegal [search], it can not be said to be sufficiently attenuated from the taint of that [search]."[44] Appellant's consent was not "an independent act of free will"[45] sufficient to cure the poisonous effects of the unlawful search.

---

[42] Id. at 308-09.
[43] Id. at 309.
[44] Khamsouk, 57 M.J. at 290.
[45] Hernandez, 279 F.3d at 307.

17

### III.  The Exclusionary Rule

The fundamental purpose of the exclusionary rule is to deter improper law enforcement conduct.  Were we to hold that Appellant's consent to search requested by agents as a direct result of, and almost immediately after, an unlawful search was sufficient to dissipate the taint of the unlawful conduct, we might well be encouraging unlawful conduct rather than deterring it.  We have not discovered, nor has the Government argued, any exception to the exclusionary rule that applies to the facts of this case.  Accordingly, we conclude that the military judge erred in not granting Appellant's motion to suppress.

The decision of the United States Air Force Court of Criminal Appeals is reversed.  The findings of guilty and sentence are set aside.  The record is returned to the Judge Advocate General of the Air Force.  A rehearing may be ordered.

BAKER, Judge, with whom CRAWFORD, Judge, joins
(dissenting):

The question presented is whether the consent Appellant
gave to Air Force Office of Special Investigations (AFOSI)
agents to search his computer vitiated the taint of the initial
unlawful search of the same computer.

The exclusionary rule is a "judicially prescribed remedial
measure" that is not intended to apply in all instances where
evidence is acquired following an illegal search.  Segura v.
United States, 468 U.S. 796, 804 (1984).  The rule recognizes
that while government agents should not profit from illegal
searches, they should also not "'be placed in a worse position
than [they] would otherwise have occupied.'"  United States v.
Haynes, 301 F.3d 669, 681-82 (6th Cir. 2002) (quoting Murray v.
United States, 487 U.S. 533, 542 (1988)).

The rule should not apply in circumstances where the
connection between a first unlawful search and the discovery of
evidence in a second search is "'so attenuated as to dissipate
the taint'" of earlier government misconduct.  Segura, 468 U.S.
at 805 (quoting Nardone v. United States, 308 U.S. 338, 341
(1939)).  A second search is sufficiently attenuated from a
prior unlawful search if the government can show "'there was
some significant intervening time, space, or event'" between the

two searches.  Haynes, 301 F.3d at 682 (quoting United States v. Buchanan, 904 F.2d 349, 356 (6th Cir. 1990)) (citation omitted).

A suspect's voluntary consent to a second search by law enforcement may be an attenuating event that removes the taint of a prior illegal search, so long as the consent is "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  Brown v. Illinois, 422 U.S. 590, 599 (1975) (citation and quotation marks omitted); see also United States v. Beason, 220 F.3d 964, 967 (8th Cir. 2000) (consent to a search is a sufficient act of free will to purge the primary taint).  In United States v. Khamsouk, this Court, borrowing from Brown, applied a three-factor analysis to determine whether an appellant's consent to search his bags was an act of free will and sufficiently attenuated from a prior illegality.  57 M.J. 282, 291-94 (C.A.A.F. 2002).  These factors included: "'the temporal proximity of the arrest and the confession, particularly, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.'"  Id. at 291 (quoting Brown, 422 U.S. at 604).

Applying the Brown factors to the specific circumstances of the initial search in this case, I conclude that the second search was sufficiently attenuated and Appellant's consent vitiated the taint of the first unlawful search.  Therefore, I respectfully dissent.

2

Temporal Proximity

The government bears the burden of demonstrating that an act of subsequent consent was voluntary and sufficiently a product of free will to purge the primary taint of the unlawful invasion. Khamsouk, 57 M.J. at 291. Courts look to a variety of factors in addressing this question, including the characteristics of the accused, whether the accused understands his or her right to refuse consent, the accused's knowledge of the prior illegality, and the nature of the detention, if any. See United States v. Jones, 234 F.3d 234, 242-43 (5th Cir. 2000); Haynes, 301 F.3d at 682-84. No factor is dispositive and each case must be addressed on its own merits and facts. Khamsouk, 57 M.J. at 290-91.

In this case, the record reflects that Appellant was not privy to the initial unlawful search, and that he was instead approached in the dining facility by two AFOSI agents about three hours later. Appellant was not in custody. The agents were aware of the prior search and the evidence identified during the search but they did not conduct the first search themselves. Significantly, the record does not reflect that Appellant was informed of the prior search and its result before he gave consent to a second search.

Thus, unlike the circumstances in United States v. Hernandez, 279 F.3d 302, 305 (5th Cir. 2002), the request for

consent by the AFOSI agents did not immediately follow the Fourth Amendment violation.  Appellant did not know of the prior unlawful act, and thus did not face "the sense of futility" and psychological disadvantages that might arise if the individual concludes that the "'cat is already out of the bag[.]'" Commonwealth v. Peleeki, 818 N.E. 2d 596 600 (Mass. App. Ct. 2004) (quoting Darwin v. Connecticut, 391 U.S. 346, 351 (1968) (Harlan, J., concurring in part and dissenting in part)).

Further, Appellant was advised that the purpose of the search was to look for child pornography, and thus, he was aware of the context of the consent request.  In addition, he was advised of his right to withhold consent and he acknowledged his understanding of this right in writing.  Based on these circumstances, I conclude this factor weighs heavily in favor of the Government.  See United States v. McGill, 125 F.3d 642, 644 (8th Cir. 1997) (consent an act of free will where suspect was informed and understood his right to withhold consent); see also United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (taint from initial unlawful search purged when suspect gave consent after given oral and written instruction that he did not have to provide consent).

United States v. Conklin, No. 05-0220/AF

Intervening Circumstances

I agree with the majority that there were no intervening circumstances between the unlawful search and Appellant's subsequent consent to the second search.

Purpose and Flagrancy

The third "purpose and flagrancy" factor identified in Brown presents a closer question and is the key to this case. As this Court has recognized, the third Brown factor is particularly important because it comes closest to the exclusionary rule's primary purpose: "'the deterrence of police conduct that violates Fourth Amendment rights.'" Khamsouk, 57 M.J. 291-92 (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)).

The exclusionary rule has "never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." Stone, 428 U.S. at 486. Rather, the Supreme Court has sought to strike a balance between society's interest in the "'determination of truth at trial'" and the "'incremental contribution that might [be] made to the protection of Fourth Amendment values'" through application of the rule. Khamsouk, 57 M.J. at 292 (quoting Stone, 428 U.S. at 488). These values, of course, protect society as a whole and not just those brought before the bar of justice.

The Supreme Court has sought to find this proportionality by distinguishing between cases where police intentionally

5

violate what they know to be a constitutional command, and evidence that is a product of good faith misunderstanding of the relevant constitutional requirements, as well as technical, trivial, or inadvertent violations. Brown, 422 U.S. at 610-12 (Powell, J., joined by Rehnquist, J., concurring in part). As Justice White summarized:

> [D]eserving of exclusionary treatment are searches and seizures perpetrated in intentional and flagrant disregard of Fourth Amendment principles. But the question of exclusion must be viewed through a different lens when a Fourth Amendment violation occurs because the police have reasonably erred in assessing the facts, mistakenly conducted a search authorized under a presumably valid statute, or relied in good faith upon a warrant not supported by probable cause.

Illinois v. Gates, 462 U.S. 213, 261 n.14 (1983)(White, J., concurring in the judgment).

In short, the rule is best applied when its "'remedial objectives are thought most efficaciously served.'" Khamsouk, 57 M.J. at 292 (quoting Penn. Board of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998) (quoting Stone, 428 U.S. at 486; United States v. Calandra, 414 U.S. 338, 348 (1974))).

In my view, the conduct of the dorm inspectors and AFOSI agents in this case falls somewhere between the exclusionary extremes; it represents neither flagrant conduct nor a merely technical or trivial violation of the Fourth Amendment. On the one hand, the dorm inspectors conducting the initial unlawful search, Technical Sergeant (TSgt) Schlegel, Staff Sergeant

6

(SSgt) Roy, and SSgt Wilcox, were lawfully within the dorm room conducting a health and welfare inspection.  The search was precipitated by their identification of adult pornography in plain view.  Significantly, TSgt Schlegel previously sought legal advice from AFOSI in a similar incident, and he relied upon this advice before searching Appellant's computer.  The advice was erroneous, but neither TSgt Schlegel nor the AFOSI agents pursued a purposeful policy of violating rights with the intention of later obtaining cleansing consents.  Rather, the unlawful search in this case was not part of a policy to circumvent servicemembers' rights.  Moreover, the search did not occur in the home, where the Fourth Amendment comes closest to black letter law, but rather in the context of a military barracks and an inspection search where case law reveals evolving principles of privacy and careful contextual applications of Fourth Amendment principle.  See, e.g., United States v. Jackson, 48 M.J. 292, 293-94 (C.A.A.F. 1998).

Based on these circumstances, I conclude that Appellant's voluntary consent, given without knowledge of the prior search, vitiated the taint of the unlawful search, even if the AFOSI agents' motive in requesting Appellant's consent was supplied by the prior unlawful search.  Further, applying the concepts of proportionality essential to justice embodied in the exclusionary rule, the legal policy purposes of the exclusionary

rule would not otherwise be served through application of the rule in this case.