*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0500p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    *v.*

No. 06-2525

LAKENTO BRIAN SMITH,

    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 06-00032—Robert Holmes Bell, Chief District Judge.

Argued: October 23, 2007

Decided and Filed: December 26, 2007

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Frank E. Stanley, Grand Rapids, Michigan, for Appellant. Phillip J. Green, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Frank E. Stanley, Grand Rapids, Michigan, for Appellant. Phillip J. Green, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

    JULIA SMITH GIBBONS, Circuit Judge. On November 8, 2006, a jury found defendant-appellant Lakento Brian Smith guilty of a number of drug-trafficking and firearm-possession charges. At a suppression hearing held prior to Smith's jury trial, the district court denied Smith's motion to suppress evidence seized from his residence during the execution of a search warrant, as well as evidence seized from his vehicle during a warrantless search. On appeal, Smith contends that the district court erred in admitting this evidence. For the reasons set forth below, we affirm the judgment of the district court.

I.

    The search and seizure of evidence in Smith's residence and vehicle was the culmination of a seven-month investigation conducted by the Drug Enforcement Administration ("DEA") and the West Michigan Enforcement Team ("WEMET"), a multi-jurisdictional drug unit operating under the Michigan State Police. The investigation of Smith was precipitated by the arrival of two

1

suspicious packages at a United Parcel Service ("UPS") location in Romulus, Michigan, on March 18, 2005.  Upon receipt of these packages, which were addressed to Toriano Green, UPS contacted the DEA.  The DEA opened the packages after obtaining a search warrant and found that they contained approximately three kilograms of cocaine.  On the same day, UPS delivered the packages to the recipient, Green, who was subsequently arrested.  Green agreed to cooperate with the DEA by contacting the person for whom the packages were ultimately intended; this individual, Marquan Wilson, was arrested when he accepted the packages from Green.  One of two cellular phones in Wilson's possession contained the telephone number of the defendant, Smith, in its address book; eleven calls were placed between Wilson's and Smith's telephones on March 18—when the packages were received—and March 19—when Wilson was arrested.

After Wilson's arrest, the DEA began collaborating with the WEMET on an investigation of Smith.  Together, the DEA and the WEMET conducted a number of interviews of cooperating individuals, as well as an investigation into Smith's finances.  On June 20, 2005, Opey McGee, a drug-trafficking defendant in Muskegon County, Michigan, told investigators that Wilson was the source of Smith's drug supply.  McGee also stated that Smith possessed $33,000 in stolen cash, guns, and clothing.  On August 31, 2005, Kevin Lattimore, a defendant in a pending federal case, told investigators that Smith was a major distributor of crack cocaine in Muskegon.  Lattimore identified Tyree Brown as one of the individuals who sold drugs on Smith's behalf.  Additionally, Lattimore stated that he had observed Smith driving around with approximately one kilogram of cocaine.  On September 13, 2005, Ricky Farmer, a defendant awaiting sentencing in Muskegon County, also stated that Wilson supplied drugs to Smith.  Farmer allowed Smith to "cook" crack cocaine at his house from December 2004 to April 2005.  In exchange, Smith provided Farmer with crack cocaine.  Farmer stated that Smith always arrived at his house in a 2003 cream-colored Cadillac DTS but noted that Smith also owned a Corvette and a Monte Carlo, all of which were purchased with cash.  Farmer advised that Smith lived with Angela Savage in the Hackley Glen area of Muskegon and that he had numerous weapons.  Although Smith held a job for a short time after being released from his previous prison term, Farmer noted, he had not been employed since.

The DEA and the WEMET attempted to corroborate the information obtained in these interviews.  The DEA verified that three vehicles with no outstanding liens on them were registered to Smith: a Corvette, a Monte Carlo, and a Ford station wagon.  The DEA also confirmed Smith's address in the Hackley Glen neighborhood.

Meanwhile, the WEMET cultivated a relationship with a confidential informant ("CI") to facilitate the investigation of Smith.  Detective Timothy Lewkowski of the WEMET, the principal officer involved in the Smith investigation, utilized the CI to purchase drugs from Smith's organization.  The CI made purchases from Smith and his associates, including Tyree Brown (also known as "Reefer"), Marlando West (also known as "Little Mannie"), and Mark Graham.

One such controlled purchase transpired on June 28, 2005, when the CI informed investigators that Smith had contacted him.  Smith informed the CI that he could provide him with cocaine.  The money for the purchase was to be deposited at Smith's residence at 1484 Albert Street in Muskegon, Michigan.[1]  When the CI delivered the purchase money, Smith was not home, but a vehicle, a Monte Carlo belonging to Smith, was driven to the residence during the transaction.  The CI reported that the drugs were not actually transferred at the time; several days later, on July 1, Marlando West advised the CI to go to 743 Amity—Tyree Brown's residence—to obtain the cocaine.

---

[1]Prior to utilizing the CI, investigators had determined that Smith's Hackley Glen residence had been robbed and Smith had subsequently moved to 1484 Albert Street.

On July 3, 2005, the CI informed investigators that Smith had offered to sell two ounces of cocaine to him. The CI gave the purchase money to Mark Graham at 743 Amity. Tyree Brown contacted the CI two days later and told him to pick up the cocaine at 743 Amity. Investigators conducting surveillance of 743 Amity during this transaction observed Smith's Monte Carlo parked in front of the residence but did not see Smith himself.

On August 29, 2005, the CI and Smith discussed the purchase of two ounces of cocaine. Smith again instructed the CI to go to 743 Amity, and the CI believed that Smith would be present on this occasion. Once the CI arrived, however, individuals in front of the residence informed him that Smith had left the location because he believed that the DEA was investigating his organization. The CI then purchased cocaine from an individual at 743 Amity.

Yet another controlled purchase occurred on October 6, 2005. The CI contacted Smith via cellular phone, and Lewkowski listened to the conversation. Smith and the CI determined that they would meet on Oak Street, near Williams Street, to conduct a cocaine purchase. The rendezvous occurred as planned, and, according to the CI, Smith was driving the vehicle that arrived at the agreed-upon location. The investigators observing the transaction did not see Smith, however, as they had lost sight of the vehicle. The CI stated that Smith directly sold him the cocaine in this transaction.

On October 25, 2005, a WEMET detective received an anonymous tip informing him that Smith had received a large shipment of cocaine, which he was storing at 1484 Albert. The tipster also noted that Smith was driving a brown Yukon/SUV-type vehicle. Lewkowski then began surveillance for this vehicle at 1484 Albert. After observing the vehicle at the residence, the detective determined that its license plate was registered to Smith.

Lewkowski obtained a search warrant for 1484 Albert on October 27, 2005. On the same day, Lewkowski discussed the warrant with Agent Kent Kleinschmidt of the DEA. In particular, the investigators discussed whether assets should be seized at the residence during the execution of the warrant. Kleinschmidt opined that the controlled buys and the information obtained from the joint DEA-WEMET investigation of Smith gave the investigators probable cause to seize Smith's assets for forfeiture as drug trade proceeds. The investigators agreed that during the execution of the warrant, officers would seize any vehicles found that were registered to or owned by Smith.

Lewkowski served as the affiant for the search warrant. In the affidavit, Lewkowski stated that he had twelve years of experience as an officer and had been investigating drug trafficking for seven years. Lewkowski explained that he had used the CI to make eight controlled drug buys and that these buys had resulted in two search warrants and four arrest warrants. He noted the CI had informed him that Smith deals in large amounts of cocaine, and that when Smith receives a large shipment of cocaine, he stores it at 1484 Albert. Lewkowski recounted two incidents, one of which had taken place two days earlier, in which the CI was in the company of a person known as "S1"; although the CI did not witness the actual drug transactions, on both occasions, the CI observed that S1 entered 1484 Albert with no cocaine in his possession and exited the residence with cocaine. Also noted in the affidavit was the anonymous tip, described above, regarding the arrival of a shipment of cocaine at 1484 Albert. Finally, Lewkowski recounted Smith's criminal history: Smith was convicted of cocaine-trafficking charges in 1994 and 1997. The warrant authorized the search of 1484 Albert and "any vehicles located on the premises."

Around 11:15 p.m. on October 27, the evening before officers executed the search warrant, Lewkowski drove by 1484 Albert. He observed three vehicles on the premises of the residence: a Yukon/SUV-type vehicle registered to Smith in the driveway, a cream-colored car in the driveway, and a green Pontiac Grand Am in the garage.

The execution of the warrant occurred in the early morning hours of October 28, 2005. Officers found a large quantity of cash, just over $17,000, in the residence, although they did not locate any of the marked money used by the CI to purchase cocaine. The money was hidden around the residence in odd places, such as in coats. Sandwich-sized plastic bags with residue in them were located in the trash at the residence; lab testing revealed that this residue was cocaine. Three semiautomatic guns were found in the residence, as well as a Taser device, expensive jewelry, and valuable electronic equipment. Officers seized some of these items for forfeiture, as proceeds of drug trafficking. Smith was arrested during the search.

Before the execution of the search warrant, the green Pontiac had been moved onto the public street, just off the premises of 1484 Albert. Nonetheless, officers searched and inventoried the vehicle on location after searching the residence. Prior to the search of the Pontiac, officers found both the keys and the vehicle's registration, listing the names of Smith and Angela Savage and the 1484 Albert address, in the residence. Officers further verified the ownership of the vehicle by searching for its license plate number in the Michigan LEIN system. During the search of the Pontiac, officers discovered 1250.7 grams of powder cocaine, 256.1 grams of crack cocaine, a hand mixer, and two digital scales, one of which bore Smith's fingerprints. Lewkowski testified that the WEMET has a policy regarding the inventorying of vehicles that are seized for forfeiture: officers must complete a form describing any property found in the vehicle that is not attached to the vehicle.

On February 3, 2006, a federal grand jury returned a three-count indictment, charging Smith with (1) possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (2) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), and (3) being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1). Smith subsequently filed a motion to suppress the evidence seized from his residence during the execution of the search warrant, the evidence seized from his Pontiac, and the statements he made to police during his interrogation. On May 11, 2006, a grand jury returned a superseding four-count indictment, which charged Smith with the three original counts as well as conspiracy to distribute 500 grams or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. § 846.

The district court held a suppression hearing on May 24, 2006, and, after hearing evidence and argument, denied Smith's motion to suppress. Ruling from the bench, the court found the search warrant to be valid on its face. The court then held that because the Pontiac was not on the premises of 1484 Albert when the residence was searched, it was outside the scope of the search warrant. Nonetheless, the court determined that the warrantless search of the vehicle was valid pursuant to both the automobile exception and the inventory exception to the warrant requirement.

Smith's trial commenced on June 26, 2006. On June 29, 2006, a jury returned a verdict of guilty on all counts of the superseding indictment. On November 1, 2006, the district court sentenced Smith to life in prison on Counts 1 and 2 of the superseding indictment, 360 months imprisonment on Count 3, and 120 months imprisonment on Count 4, with all sentences running concurrently. Smith filed a timely notice of appeal on November 8, 2006.

II.

In reviewing a district court's denial of a motion to suppress, this court defers to the district court's findings of fact unless they are clearly erroneous and reviews the district court's legal conclusions *de novo*. *United States v. Swanson*, 341 F.3d 524, 531 (6th Cir. 2003). The court reviews the evidence "in a light most likely to support the decision of the district court." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). In the instant case, the district court concluded that there was probable cause to support a warrantless search of the Pontiac under the automobile

exception to the warrant requirement, and, moreover, the search was also lawfully conducted as an inventory search.[2] We agree.

A.

Generally, the Fourth Amendment requires police officers to obtain a warrant prior to conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)). However, the Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles. *Id.* (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). The Court's initial cases establishing the "automobile exception" were premised on the "ready mobility" of the automobile, which created "an exigency sufficient to excuse failure to obtain a search warrant." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *Carney*, 471 U.S. at 390-91. More recent Supreme Court jurisprudence, however, has provided an additional justification for the exception: "Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Carney*, 471 U.S. at 391. The Court has emphasized that the exception has no separate exigency requirement. *Dyson*, 527 U.S. at 466.

Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (citations omitted); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (citations omitted). Probable cause is defined as "'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *Smith*, 136 F.3d at 1074 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). The court's determination of whether probable cause existed at the time of the search is a "'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *Id.* at 1074-75 (citations omitted). In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the "objective facts known to the officers at the time of the search." *Id.* at 1075. Probable cause "may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *Lumpkin*, 159 F.3d at 986.

In holding that the Pontiac was validly searched under the automobile exception to the warrant requirement, the district court noted the following facts: (1) the car was previously seen on the premises but was slightly off the premises when searched; (2) the keys to the car were found inside Smith's residence; (3) Smith was a co-owner of the car; (4) Smith and his confederates were alleged to have "moved about when disposing of controlled substances by way of vehicles"; (5) Smith and his confederates sold controlled substances out of vehicles; (6) a significant amount of cash was found at Smith's residence; (7) there was a history of drug dealing on the premises; (8) residue was found in baggies in trash pulls at the residence; (9) guns were discovered in the residence; and (10) there were "other indica of a lifestyle" that would suggest drug dealing. The court concluded that these facts gave the police officers probable cause to believe the car should be "if not immediately searched, at least taken as part of the seizure of vehicles used in the course of drug trafficking and inventory-searched."

Smith contends that the factual similarity of his case to *United States v. Haynes*, 301 F.3d 669 (6th Cir. 2002), and *United States v. Edwards*, 242 F.3d 928 (10th Cir. 2001), necessitates a finding that police officers lacked probable cause to search his Pontiac. In *Haynes*, this court concluded that police officers did not have probable cause to search the vehicle of a man who had

---

[2]The government does not contest the district court's determination that the Pontiac was beyond the scope of the search warrant.

been arrested in an apartment building on suspicion that he had stolen firearms and jewelry. 301 F.3d at 672, 677. Officers in Tennessee had received information from authorities in Illinois that the defendant, Haynes, was wanted for burglaries and parole violations; when officers learned of Haynes's whereabouts—an apartment in Union City—they arrested him inside the apartment building. *Id.* at 672-76. Officers subsequently searched his vehicle, which was parked outside of the building, without his consent. *Id.* The court held that "none of the officers had been given any information that would lead to any more than a mere suspicion" that Haynes had stored stolen items in his vehicle, and, thus, the officers lacked probable cause to search the vehicle. *Id.* at 678.

Similarly, in *Edwards*, the Tenth Circuit concluded that police officers did not have probable cause to search the vehicle of an individual arrested outside a bank on suspicion of bank robbery. 242 F.3d at 931. Responding to a silent alarm tripped by a bank employee, officers found Edwards standing in front of the bank with an open bag containing about $2,000 covered in red dye. *Id.* After arresting Edwards, officers learned that the bank had not actually been robbed (Edwards had robbed a different bank). *Id.* Nonetheless, officers decided to search a rental car used by Edwards and parked in the bank's lot. *Id.* at 931-32. In determining that the officers lacked probable cause to conduct this search, the court noted that Edwards was not arrested near the vehicle and there was "no testimony presented at the suppression hearing that would support a belief by the police that additional contraband or evidence could be found in the vehicle." *Id.* at 939.

*Haynes* and *Edwards*, however, are both factually distinguishable from this case. In both cases, the officers had *no* information or evidence that suggested the vehicles in question contained contraband. *Haynes*, 301 F.3d at 678; *Edwards*, 242 F.3d at 939. Here, on the other hand, prior to the search of the car, officers did have knowledge of a number of "objective facts" indicating that the Pontiac might contain contraband. In the course of a lengthy investigation of Smith, officers learned that Smith owned a number of vehicles, transported drugs in vehicles, and sold drugs out of vehicles. Specifically, Ricky Farmer noted that Smith owned numerous vehicles, and detectives confirmed Smith's ownership of these vehicles. Kevin Lattimore told investigators that he had observed Smith driving around with approximately a kilogram of cocaine. Moreover, on one occasion, Smith apparently sold cocaine out of his vehicle to the CI.

To be sure, in this case, officers had no information or evidence regarding the *specific* car searched—the green Pontiac Grand Am. Officers did, however, have evidence of Smith using *other* vehicles to transport drugs or transact drug deals, as noted above. Additionally, around 11:15 p.m. on October 27—after the search warrant had been granted, but before it was executed—Lewkowski observed the Pontiac on the premises of the location to be searched; the vehicle was in Smith's garage. Had the search warrant been executed a few hours earlier, the Pontiac would have easily fallen within the ambit of the warrant, which permitted the search of 1484 Albert and all vehicles on the premises. Furthermore, by the time the officers searched the Pontiac, they had confirmed that it was registered to Smith and his girlfriend.

Moreover, when the officers searched the Pontiac, they possessed information—gleaned both from the lengthy investigation of Smith and from the warrant-supported search of his residence—suggesting that Smith trafficked in cocaine and that he used 1484 Albert to store evidence of his drug trafficking. The prior months' investigation of Smith indicated that he stored cocaine at his 1484 Albert residence: the CI told police that he had heard that Smith stored cocaine at 1484 Albert, and the anonymous tipster informed police that Smith had received a large shipment of cocaine and was storing it at his 1484 Albert residence. During the search of the residence, officers found "sandwich-size baggies" with a residue in them, which, as Lewkowski noted,

"indicate[d] drug sales" to him.[3]  The officers also found about $17,000 in cash stuffed in odd places around the residence,  expensive jewelry and electronics, and a number of firearms.  The officers thus found both evidence of drug sales and, possibly, the proceeds of drug sales in the residence.  They did not, however, find the shipment of cocaine that the anonymous tipster referenced.  Because the officers were aware of Smith's use of vehicles in his drug-trafficking activities, and because they had information indicating that Smith stored cocaine at his residence, there was a "fair probability" that contraband—in this case, the cocaine referenced by the tipster—would be found in the Pontiac.[4]  *See Smith*, 136 F.3d at 1074 ("Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (internal quotation marks and citations omitted).

Smith suggests that the automobile exception is not applicable in the present case because the Pontiac was not mobile: at the time of the search, the officers possessed the keys and had the only two users of the vehicle under their control.  However, both this court and the Supreme Court have reiterated on numerous occasions that the automobile exception is justified not only by the exigency created by the "ready mobility" of vehicles, but also by the lesser expectation of privacy operators have in their vehicles.  *Carney*, 471 U.S. at 391; *Graham*, 275 F.3d at 509.  This court, moreover, has upheld warrantless automobile searches in which officers were in control of both the keys to the vehicle and the operator of the vehicle.  *See Graham*, 275 F.3d at 507-11; *see also Hofstatter*, 8 F.3d at 322 ("Although the government might have had time to secure a warrant to search the automobile, there was no requirement that it do so.").

Furthermore, Smith's argument that Angela Savage's co-ownership of the vehicle "cuts against probable cause" is unavailing.  Her co-ownership of the vehicle simply has no legal significance in the determination of whether the officers had probable cause to search the Pontiac.  *Cf. United States v. Decker*, 19 F.3d 287, 290 n.8 (6th Cir. 1994) (*per curiam*) (noting that analysis of inventory exception to the warrant requirement was not affected by the availability of an innocent owner defense to defendant's wife, who owned the car that was seized for forfeiture and searched).  To the extent that Smith argues that Savage's co-ownership of the Pontiac suggests that this particular vehicle was less likely to contain contraband than other vehicles registered in Smith's name only, we find this argument unpersuasive.

We conclude that, given the totality of the circumstances, officers had probable cause to search the Pontiac pursuant to the automobile exception to the warrant requirement.  The district court did not err in admitting evidence seized from the vehicle.

---

[3]The residue in the bags tested positive for cocaine.  Presumably, the officers did not have these test results before they searched the Pontiac.

[4]Certainly, in other cases in which the Sixth Circuit has held that there was probable cause to search a vehicle, officers had even stronger facts supporting their search of the vehicle in question.  *See, e.g.*, *United States v. Hofstatter*, 8 F.3d 316, 322 (6th Cir. 1993) (*per curiam*) (finding that an officer had probable cause to search a vehicle where the officer had observed defendant place methamphetamine analogue precursor chemicals in his car and later take items out of his car).  However, the officers in the present case were in possession of at least some information indicating that contraband would be found in the vehicle; the information obtained during the search of the residence, as well as the knowledge the officers gleaned during the course of the investigation into Smith, gave them sufficient probable cause to search the vehicle.  *Cf. United States v. Graham*, 275 F.3d 490, 511 (6th Cir. 2001) (finding that an officer had probable cause to search a vehicle based on information obtained during the course of an investigation of defendant and evidence found during the search of defendant's residence indicating that certain illicit firearms were "unaccounted for.")

B.

Alternatively, the search of the vehicle may also be upheld pursuant to the inventory exception to the warrant requirement. A valid inventory search conducted without a warrant does not violate the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 369-71 (1976); *Decker*, 19 F.3d at 289. Inventory searches "'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Lumpkin*, 159 F.3d at 987 (quoting *Colorado v. Bertine*, 479 U.S 367, 372 (1987)). In order to be deemed valid, an inventory search may not be undertaken "for purposes of investigation," and it must be conducted "according to standard police procedures." *Id.* (citing *Florida v. Wells*, 495 U.S. 1, 5 (1990)). However, the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search. *Id.* (citations omitted).

A warrantless inventory search may only be conducted if police have "lawfully tak[en] custody of a vehicle." *Id.* When police have probable cause to believe that an automobile is forfeitable contraband, it may be seized from a public place without a warrant. *Florida v. White*, 526 U.S. 559, 561 (1999); *Decker*, 19 F.3d at 290. Additionally, we have held that a pre-forfeiture inventory search of a vehicle does not require a warrant. *Decker*, 19 F.3d at 290 ("'[W]here police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the polic[e] may search the car without a warrant.'") (quoting *United States v. Pace*, 898 F.2d 1218, 1245 (7th Cir. 1990)). Pursuant to the federal forfeiture statute, "All conveyances, including . . . vehicles . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances manufactured, distributed, dispensed, or acquired in violation of this subchapter]" are subject to forfeiture. 21 U.S.C. § 881(a)(4).

Smith argues that (1) officers lacked probable cause to seize the Pontiac for forfeiture purposes and (2) the government has not established that a WEMET inventory policy existed or that it was followed in this particular case. With respect to Smith's first claim, under the probable cause analysis described above, officers had sufficient probable cause to believe that contraband—specifically, cocaine—would be found in the vehicle. Thus, it follows that the officers had probable cause to believe the car was forfeitable as a vehicle used "to transport[] or . . . facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances]." *Id.* The Pontiac thus could be lawfully seized under the forfeiture statute.

Smith also contends that the government presented insufficient evidence that a WEMET inventory policy existed or that it was followed in this particular case. At the suppression hearing, however, Lewkowski established the existence of a WEMET inventory policy regarding vehicles seized for forfeiture. Lewkowski testified that, pursuant to the WEMET policy, officers must complete a form indicating any property found in the vehicle. The detective agreed that it was the WEMET's "standard operating procedure" to do a full search of a vehicle taken into custody. "Whether a police department maintains a written [inventory] policy is not determinative, where testimony establishes the existence and contours of the policy." *United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007) (accepting officers' testimony as proof of inventory policy) (citations omitted).

Given that the officers had probable cause to believe that the Pontiac could be seized as forfeitable contraband and that Lewkowski testified as to the existence of the WEMET's inventory policy, we hold that the vehicle was also validly searched pursuant to the inventory exception to the warrant requirement.

III.

Turning to Smith's challenge to the search of his residence, again we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Swanson*, 341 F.3d 524, 531 (6th Cir. 2003). Furthermore, we must give "great deference" to the issuing magistrate's probable cause determination. *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993). "[A]n issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (*en banc*). In the instant case, the district court concluded that there was probable cause to support the search warrant.

A warrant will be upheld if the affidavit provides a "substantial basis" for the issuing magistrate to believe "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. King*, 227 F.3d 732, 742 (6th Cir. 2000). The Supreme Court has adopted a "totality of the circumstances" approach to reviewing the sufficiency of an affidavit underlying a search warrant. *Allen*, 211 F.3d at 972 (citing *Gates*, 462 U.S. at 230-32). Under this approach, an issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information," there is probable cause. *King*, 227 F.3d at 740 (quoting *Gates*, 462 U.S. at 238). An officer may rely upon information obtained from a confidential informant "so long as the issuing judicial officer is reasonably assured that the informant was credible and the information reliable." *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000).

In determining whether there was sufficient probable cause to support the search warrant, *United States v. Allen* is particularly instructive. In *Allen*, this court, sitting *en banc*, sought to clarify Sixth Circuit law "regarding the necessary requirements for the issuance of a search warrant based on uncorroborated information from an informant." 211 F.3d at 973 (quotation marks and citation omitted). The court noted that there is no general proposition "that a CI's information must always be independently corroborated by police, or that an affidavit must in every case set out and justify a CI's expertise in identifying the particularities of the criminal activity alleged." *Id.* at 974. The court explained that an affidavit should be "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Id.* at 975.

In the instant case, although the CI was not identified to the issuing magistrate, the affidavit amply describes the reliability of the CI. Lewkowski averred that he had used the CI to make eight controlled drug buys and that these buys resulted in two search warrants and four arrest warrants. According to the affidavit, the CI told the detective that Smith deals in cocaine and receives large shipments of cocaine at 1484 Albert. Moreover, the affidavit recounts two occasions on which the CI observed "S1" enter 1484 Albert without cocaine and leave the residence with cocaine. To be sure, the affidavit does not state how or if Lewkowski corroborated this particular information.[5] But police need not always independently corroborate a CI's information; rather, the court must consider the totality of the circumstances in determining the validity of a search warrant. *Allen*, 211 F.3d at 792, 794. Here, the affidavit contains additional information to aid in establishing probable cause: the anonymous tip, received two days before the issuance of the warrant, relating that Smith had received a large shipment of cocaine at 1484 Albert and that Smith was driving a brown SUV. The affidavit further explains that Lewkowski corroborated this information by observing a brown SUV

---

[5] Evidence presented at the suppression hearing shows that the CI's statements regarding Smith's cocaine trafficking were corroborated by the interviews the DEA and the WEMET conducted during their investigation of Smith, but the affidavit does not include this information. This court's "review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Thus, contrary to the government's assertion, this information cannot be considered in our probable cause analysis.

registered to Smith at 1484 Albert. Lewkowski also confirmed that Smith lived at 1484 Albert and verified the description of the residence. Finally, the affidavit recounts Smith's two previous cocaine convictions.

Smith contends that because the CI lacked personal, firsthand knowledge that cocaine was being sold or stored on the premises of 1484 Albert, the information contained in the affidavit is insufficient to establish probable cause. However, "lack of . . . firsthand observation" is not necessarily "fatal to an affidavit." *King*, 227 F.3d at 742. Rather, under the totality of the circumstances test, "the strength of one factor may compensate for the inadequacy of another factor." *Id.* (citing *Gates*, 462 U.S. at 238-39). In *King*, the affidavit in question did not state that the CI involved in the investigation had directly observed the delivery of crack cocaine to the defendant's residence. *Id.* However, the *King* court noted that other factors compensated for this inadequacy: (1) the CI had provided credible information in the past which had led to the arrest and conviction of numerous individuals; (2) the tip was corroborated by the detective's independent investigation verifying the vehicle and address described by the informant; (3) the detective verified the defendant's history of criminal offenses; and (4) the detective verified the name of the defendant's drug supplier, which was provided by the informant. *Id.*

Here, numerous factors—many of those cited by the *King* court—compensate for the CI's lack of personal observation of cocaine at 1484 Albert. Lewkowski averred that the CI had previously provided credible information leading to the issuance of a number of warrants. Additionally, the detective verified Smith's criminal history and his address. Furthermore, the anonymous tip regarding the shipment of cocaine being stored at Smith's residence bolstered the CI's information regarding Smith's drug dealing at 1484 Albert. The anonymous tip itself was corroborated by Lewkowski's verification that the vehicle referenced by the tipster did, in fact, belong to Smith. Given the totality of the circumstances, the information proffered in the affidavit provided a substantial basis to support the magistrate's finding of probable cause. *See id.* Accordingly, we conclude that the district court did not err in denying the suppression of evidence obtained from Smith's residence.

IV.

For the foregoing reasons, we affirm the decision of the district court.